In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1364

JAYMZ HERNANDEZ, by his parents and
next friends Crystelle Hernandez and
Joshua Hernandez, et al.,

*Plaintiffs-Appellants*,

*v.*

LAKESHA FOSTER, DCFS investigator,
in her individual capacity, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-02461—**Suzanne B. Conlon**, *Judge.*

ARGUED FEBRUARY 8, 2011—DECIDED AUGUST 26, 2011

Before SYKES, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* The Illinois Department of Chil-
dren and Family Services ("DCFS") took fifteen-month-old
Jaymz Hernandez away from his home and parents
and into temporary protective custody. Jaymz and his
parents, Crystelle and Joshua Hernandez, later sued the

defendants-appellees, Lakesha Foster, a DCFS investigator; her supervisor, Pamela Foster-Stith; and Michael Ruppe, DCFS Assistant Regional Manager, alleging violations of their constitutional rights. The district court granted summary judgment to the defendants on qualified immunity grounds, and the plaintiffs appealed. We affirm in part and vacate in part.

## I.  Background

### A.  September 8, 2008

In the morning of September 8, 2008, Crystelle and Joshua Hernandez took their fifteen-month-old son, Jaymz Hernandez, to Sherman Hospital, stating that they thought he had fallen out of his crib, a distance of approximately three to four feet to the tiled floor. Nurse Lisa Luebke noted that she asked the parents if Jaymz was walking or climbing, and Crystelle said that he "is not walking or climbing, but [she] doesn't know how he fell out of [his] crib," which had its side rails up and was locked. The parents also told the treating physician, Dr. Natalie Kostinsky, that Jaymz was not walking or climbing. X-rays were taken, and the radiologist diagnosed a torus fracture of the distal right radius and ulna. This type of fracture is not a complete fracture and is also referred to as a buckle fracture. It is a common injury in children and can be sustained by a fall of a few feet onto a tiled floor. Dr. Kostinsky concurred with the diagnosis.

Nurse Luebke noted in the hospital record that the parents' "story doesn't sound correct." Around 12:00 p.m.,

she called the DCFS hotline, reporting that Jaymz had a right forearm fracture and a "story inconsisten[cy]." Nurse Luebke advised that Jaymz was not yet walking or climbing, but the parents claimed he fell out of his crib, although the crib railing was up and locked and neither parent saw him fall. (The mattress was not in its lowest position, but the record does not disclose that the nurse was aware of this fact.) The record of the initial report indicates that Nurse Luebke stated that the parents' "story d[id] not fit Jaymz's fracture." She also reported that Jaymz had old bruises above his left eyelid and it was unknown how he got them. DCFS advised Dr. Kostinsky to release Jaymz to his parents. Dr. Kostinsky testified that she felt Jaymz was not in immediate danger, but the case needed to be investigated. After Nurse Luebke notified Crystelle and Joshua that a report had been made to DCFS, Crystelle claimed, "Oh, [Jaymz] can walk," but denied that he could climb.

DCFS assigned an investigation into the hotline call's allegations to the team of defendant Pamela Foster-Stith, a DCFS supervisor. Foster-Stith promptly interviewed Nurse Luebke and Dr. Kostinsky by telephone. Nurse Luebke reported that Jaymz's radius and ulna were broken and he had bruising above his left eyelid. Foster-Stith's note of the interview stated that Nurse Luebke said "the story the family gave didn't match the injury." Nurse Luebke stated that the mother said the railing was up and locked and no one witnessed the incident. The nurse also reported that the father originally said he was called home from work, and then changed and said he was home when the incident oc-

curred. Dr. Kostinsky reported that both parents said Jaymz fell out of the crib and was alone in the room. She said that she noted some bruising above Jaymz's eye from a prior injury, but the parents did not report how it occurred. Dr. Kostinsky told DCFS that the parents stated there was nothing in the crib that Jaymz could have used to climb out of the crib. Dr. Kostinksy reported that she was suspicious of abuse because both parents told her that they were at home at the time of the incident, but told Nurse Luebke that the mother was home alone. The doctor added that the age and size of the child and his ability to climb up the railing and fall out of the crib also made her suspicious.

Foster-Stith prepared a plan of action and early that afternoon contacted Foster about the matter. The plan stated that the source said "Crystelle's and Joshua's story d[id] not fit Jaymz's fracture" and Jaymz also had older bruises above his left eyelid, but it was unknown how he got them. It said that the child needed to be seen at home and instructed Foster to "[r]ule out Protective custody and/or Safety Plan" and "assess for safety and risk." Shortly after preparing the action plan, Foster-Stith met with DCFS Assistant Regional Manager, defendant Mike Ruppe, to discuss the case, including the medical providers' concerns. Ruppe advised her on how to proceed, including that they needed to rule out protective custody, which we understand as meaning to eliminate this as a requirement to ensure Jaymz's safety.

Foster-Stith next contacted Nurse Luebke and Dr. Kostinsky about the exact type of fracture Jaymz

had, and they reported that he had a "buckle" fracture. Foster-Stith could not recall the significance of a buckle fracture: whether this type of fracture indicated a more serious situation or an accidental injury.

At about 4:00 p.m., Foster visited the Hernandez home. She observed Jaymz walking and climbing, playing with toys, and interacting with his mother and grand-father. She noted that his right arm was in a partial cast and he had a light scratch above his left eyelid. Foster interviewed Crystelle who reported that she, Joshua, and her father were upstairs while Jaymz was downstairs in his crib taking a nap. She said that the video baby monitor had been on, but she didn't sit and watch it the entire time. She heard Jaymz crying in an unusual manner and found him standing in front of his crib. He wouldn't calm down and frowned when he tried to use his right hand. After returning home from the hospital, she lowered the crib mattress to the lowest position.

Foster observed the Hernandez's home, including the basement where the crib was located. It was a regular-sized crib with a blanket, sippy cup, and pillow inside. A throw carpet was in front of the crib on the tiled floor. Foster also observed a video baby monitor mounted on the wall and several age-appropriate toys for Jaymz. She completed a home safety checklist and screenings for substance abuse and domestic violence, finding no evidence of either issue.

Around 4:30 p.m., Foster called Foster-Stith and re-ported that Jaymz was able to walk and climb and was

actively engaged in the home. According to Crystelle, Foster stated that "everything looks fine; there's nothing that seems suspicious or anything like that," and the supervisor responded that Foster needed to treat it just like every other protective custody case. Foster also reported that the crib was in the basement area on a tiled floor with a throw rug under it. She advised Foster-Stith that the parents really didn't know what happened and that Jaymz must have climbed up and fallen out of his crib. Foster did not comment on whether she believed the parents' explanation. Foster-Stith testified that she asked Foster to talk to the family about implementing a safety plan based on Jaymz's age, his injury, and the fact that two medical professionals said that the parents' explanation "wasn't consistent" with the injury. Foster-Stith added that she and Foster discussed implementing a safety plan with the family, and the family was resistant to a safety plan at that time. Foster could not remember if she discussed a safety plan with the Hernandezes during this visit, and her notes do not document whether or not she did.

At about 4:45 p.m., Foster-Stith met with Ruppe to discuss the case. Ruppe has no recollection of their conversation and no contemporaneous notes were taken. Foster-Stith testified that she advised Ruppe the parents had no explanation for how Jaymz actually fractured his arm or for the bruising above his eye and the family was not willing to enter into a safety plan at that time. Ruppe concluded that Jaymz was unsafe without either a safety plan or protective custody because there was conflicting information about his mobility and

who was home at the time of the injury. Ruppe explained that protective custody had to be taken because the parents would not agree to a safety plan. The "driving force" behind his decision to take protective custody was the "allegation of [a] bone fracture" to a fifteen-month-old child with "no significant or sufficient [or consistent] explanation of how that injury occurred." Ruppe approved of Foster-Stith's decision to take protective custody of Jaymz.

Right after the conversation with Ruppe, Foster-Stith contacted Foster, who was still at the Hernandez home, by phone and directed her to take protective custody of Jaymz and determine whether he could go stay with a family member. Foster-Stith explained to Foster that protective custody was needed because Jaymz had been injured in the home and no one could tell a story consistent with his injury.

At about 5:45 or 6:00 p.m., Foster took Jaymz into protective custody. She advised Crystelle (Joshua was not home) that Jaymz had to be taken into protective custody for forty-eight hours, during which time Crystelle and Joshua could not see him. Foster explained what protective custody was. She also explained that if the state's attorney were to file a petition, there would be a court hearing; but if the state's attorney did not file a petition, protective custody would lapse and they would be contacted. Foster stated that Crystelle and Joshua could have no contact with Jaymz while he was in protective custody and out of the home. She provided Crystelle with a notification of the investigation and an

investigations brochure, explaining the investigation process. At Crystelle's request and with Foster-Stith's approval, DCFS placed Jaymz in relative foster care with his great-grandparents. Foster first took Jaymz to be examined by a physician (standard procedure when a child is taken into protective custody) and then to his great-grandparents' home, accompanied by Crystelle's stepmother, who stayed there for "[a] couple of days."

## B.  September 9, 2008

Early the next day on September 9, Foster contacted Nurse Luebke who again reported that Crystelle said Jaymz could not walk or climb and that he fell out of his crib. The nurse said that the two assertions were inconsistent. She also stated that Crystelle said there was nothing in the crib for Jaymz to climb up on, "which again does not match" the claim that Jaymz fell out of his crib.

Later that morning, Jaymz was seen by an orthopedist, Dr. Arnold Herbstman, who determined that he needed a cast on his arm for three weeks. DCFS allowed Crystelle and Joshua to accompany him to this appointment. Dr. Herbstman informed Foster that the injury "did not look like any abuse or neglect . . . this type of fracture is a torus type (a little buckle) not from a twisting of the arm, it is consistent with the history of child falling from a crib, it is sustain[ed] from direct contact and there were no finger marks on his arm."

At Foster's request, Jaymz was examined later that day by an emergency medicine physician, Dr. Marcy Zirlin.

The doctor noted the wrist fracture; the physical exam was otherwise normal. She ordered a skeletal survey, which is an X-ray of all the bones in a child's body that can be used to detect bone fractures. Dr. Zirlin indicated that there were no clinical or radiographic signs of abuse. The radiologist did not disagree. In mid-afternoon, Foster informed a detective that the doctors who performed the full skeletal X-ray saw no reason to believe that Jaymz had been abused and believed the fracture was consistent with a fall from a crib.

Early that afternoon, Foster spoke with an assistant state's attorney, Julia Almeida, who told her that "there is not enough to file a petition." Almeida advised that they had "to prove immediate and urgent [need to remove a child] and I do not see that we have that." Foster understood at that time that Almeida would not be going to court on the case. Foster apparently shared this information with Foster-Stith. A short time later, Foster-Stith emailed Ruppe that Almeida didn't think there was enough for shelter care (a court hearing on protective custody). After Foster's conversation with Almeida, DCFS had no further contact with the state's attorney's office regarding the Hernandez matter.

At about 1:00 or 2:00 p.m., Foster contacted the Hernandezes by phone. Foster testified that she told Crystelle that protective custody lapsed and there would be no court hearing in the case. Crystelle stated that Foster said there was not enough evidence to take it to court. Crystelle asked Foster whether that meant Jaymz could come home, and Foster said, "No, we still

have to do investigating." So Crystelle asked when Jaymz could come home, and Foster said she did not know; she had to talk to her supervisor. According to Crystelle, she asked if she could go see Jaymz, and Foster said everything had to stay the same because the forty-eight-hour period wasn't up yet. Foster testified that she asked Crystelle whether there was a possibility of doing a safety plan until they got further into the investigation, and Crystelle was willing to discuss it.

Foster requested a second opinion about the cause of Jaymz's injury from the Multidisciplinary Pediatric Education and Evaluation Consortium (MPEEC), a DCFS-funded consortium of pediatricians who specialize in child abuse. DCFS uses MPEEC to resolve conflicting medical opinions about abuse.

**C.  September 10, 2008**

Early on September 10, Foster-Stith and Ruppe agreed to allow protective custody to lapse and decided to try to implement a safety plan under which Jaymz would remain with his great-grandparents and the parents would have supervised contact with him. At approximately 10:00 a.m., Foster visited the Hernandez home and presented the safety plan to Crystelle and Joshua. Under the terms of the safety plan, "Crystelle and Joshua Hernandez will not have any unsupervised contact with Jaymz Hernandez. Jaymz Hernandez will remain with maternal great-grandparents Yvonne and Paul Lublink." Foster told Crystelle and Joshua that once they signed it, they could see Jaymz, but they could not

be alone with him or take him anywhere. She said that they could stay at Crystelle's grandmother's house but could not have unsupervised contact with Jaymz. Foster also informed them that Crystelle's grandmother still had custody over Jaymz and they did not have their parental rights. Crystelle testified that Foster said if they "didn't sign it, [they] couldn't see him. So we were signing it." Crystelle did not ask Foster any questions about the safety plan, explaining, "I heard her say I can go see my kid, so I really didn't care." Joshua did not read the safety plan and signed it because Crystelle did. Foster also obtained Jaymz's great-grandmother's signature on the safety plan.

### D.  The Safety Plan Period

Immediately after signing the safety plan, Crystelle went to her grandmother's house to stay with Jaymz. She stayed there overnight for the eight days that the safety plan remained in effect. Joshua stayed there when he wasn't working.

On September 11, Foster spoke to MPEEC physician Dr. Rosado who had reviewed the medical notes and advised that a torus fracture "is a rare fracture in abuse [but he was] not saying it does not happen in abuse." On September 16, Crystelle met with a lawyer and told him what happened with Jaymz and that DCFS would not give him back unless she went through a lot of hoops. The lawyer called DCFS and left a message, which "raised hell" and challenged the decision not to release Jaymz to his parents.

On September 17, Foster and Foster-Stith discussed the case, noting that the safety plan needed to be updated. Foster informed Foster-Stith that the family was somewhat resistant to the safety plan and had hired an attorney. They decided that Foster would contact the attorney and explain the situation. So Foster spoke with the attorney that day and advised him that Jaymz's X-rays had been sent to a forensic physician for a determination of whether there was evidence of prior breaks and a history of abuse. The attorney reported back to Crystelle that the investigation was progressing and hopefully she would get Jaymz back right away. That evening, Foster visited Jaymz at his great-grandmother's house to monitor the safety plan and had the great-grandmother sign a new safety plan, which contained terms strikingly similar to the first.

On the morning of September 18, Foster obtained the Hernandezes' agreement to the new safety plan which, like the terminated safety plan, provided that "Crystelle and Joshua Hernandez will not have any unsupervised contact with Jaymz Hernandez. Jaymz Hernandez will remain with maternal great-grandparents." That afternoon, Foster discussed the case with DCFS supervisor Joseph Becerra, including whether the safety plan should be extended or terminated. Foster advised him that Jaymz had seen three physicians who reported his injury was consistent with an accident and the family had hired an attorney who believed there was no longer a need for a safety plan. Foster and Becerra agreed that the safety plan could be terminated. Foster also

consulted with Foster-Stith, noting the findings of Dr. Rosado, Dr. Zirlin, and Dr. Herbstman that supported the conclusion that Jaymz's injury was not due to abuse and was consistent with a history of a fall out of a crib. Foster-Stith agreed to terminate the safety plan. That evening, Foster obtained Joshua's signature on a safety plan termination agreement, thus terminating the safety plan that the Hernandezes had signed earlier that same day.

DCFS's investigation continued and ultimately concluded on November 7, 2008, with a declaration that the allegation of child abuse was unfounded—there was no credible evidence of abuse or neglect.

### E.  District Court Proceedings

The plaintiffs, Jaymz, Crystelle, and Joshua Hernandez, filed a complaint under 42 U.S.C. § 1983 against Foster, Foster-Stith, and Ruppe (along with another DCFS employee Andrew Polovin, not a part of this appeal), alleging violations of their rights under the Fourth and Fourteenth Amendments. The defendants moved to dismiss for failure to state a claim, or alternatively, on qualified immunity grounds. The motion was granted with respect to Polovin only. The defendants moved for summary judgment on qualified immunity grounds, and the district court granted their motion. The court determined that child welfare workers could have reasonably believed that taking temporary protective custody of Jaymz was supported by probable cause and that Jaymz's seizure did not violate a clearly established right. It

concluded that the Fourth Amendment rather than substantive due process governed Jaymz's initial removal and that with respect to the conditions imposed between the initial removal and the implementation of the safety plan, the plaintiffs failed to show a clearly established substantive due process right.

The court also determined that Foster's alleged statements to Crystelle in obtaining the safety plan could not reasonably be construed as threats or coercion and even if the statements were construed as coercion, DCFS was merely threatening to enforce its legal rights. Further, the court found that the plaintiffs failed to show that the safety plan affected their clearly established substantive due process rights. With regard to procedural due process, the court determined that given the reasonable suspicion of abuse, a reasonable child welfare worker could have believed that taking Jaymz into temporary protective custody, specifically placing him with other family members and limiting the parents to supervised contact while the investigation continued, did not require an immediate court hearing and order. It also ruled that the plaintiffs failed to show that the implementation of the safety plan violated their clearly established procedural due process rights. The Hernandezes appealed.

## II. Analysis

We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmovants and drawing all reasonable inference in

their favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). Summary judgment is proper when there is no genuine issue of material fact and the moving parties are entitled to judgment as a matter of law. *Id.* We review a qualified immunity determination de novo. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

Before addressing the merits, we note the defendants' request that we strike the plaintiffs' statement of facts section of their appellate brief for noncompliance with Circuit Rule 28(c). We can discern argument from fact and limit our consideration to those facts that are supported in the record. The defendants' request is denied.

## A. Qualified Immunity

Qualified immunity shields "government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware." *Siliven*, 635 F.3d at 925 (citing *Pearson v. Callahan*, 555 U.S. 223, ___, 129 S. Ct. 808, 815 (2009)). When making a qualified immunity determination, a court considers (1) whether the plaintiff's allegations show that the defendant violated a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's conduct. *Id.* at 925-26 (citing *Pearson*, 129 S. Ct. at 815); *see also Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). A court has discretion " 'in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand.'" *Siliven*, 635 F.3d at 926 (quoting *Pearson*, 129 S. Ct. at 818).

The plaintiffs bear the burden of proving that the constitutional right was clearly established. *Estate of Escobedo v. Bender*, 600 F.3d 770, 779 (7th Cir.), *cert. denied sub nom. Martin v. Hanic*, 131 S. Ct. 463 (2010). A right is clearly established "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiffs need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Estate of Escobedo*, 600 F.3d at 780 (stating that a party can demonstrate a right was clearly established by identifying "a closely analogous case" or presenting evidence that the defendant's conduct was "patently violative of the constitutional right").

### B. Fourth Amendment and Substantive Due Process Claims

Jaymz brings a Fourth Amendment claim against Foster, Foster-Stith, and Ruppe, alleging that they violated his right to be free from unreasonable seizures when they removed him from the care and custody of his parents. All three plaintiffs bring a substantive due process claim premised on (1) Jaymz's seizure or initial removal, (2) the continued withholding of Jaymz in

temporary protective custody after probable cause had dissipated (the "continued withholding" claim), and (3) conditioning the parents' contact with him on the acceptance of restrictions on their familial rights and coercing their agreement to the safety plan (the "coerced safety plan" claim). The plaintiffs do not challenge the district court's determination that Jaymz's claim premised on his initial removal should be analyzed under the Fourth Amendment. However, they argue that the court erred in granting summary judgment on these other claims.

The district court correctly decided that Jaymz could not maintain a substantive due process claim premised on his initial removal. "[S]ubstantive due process may not be called upon when a specific constitutional provision (here, the Fourth Amendment) protects the right allegedly infringed upon." *Doe v. Heck*, 327 F.3d 492, 518 n.23 (7th Cir. 2003) (concluding that a child's constitutional claim premised on his seizure is analyzed under the Fourth Amendment rather than substantive due process unless it is alleged that the seizure "coincided with other conduct amounting to an interference with the parent-child relationship"); *see also Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1017-18 (7th Cir. 2000) (concluding that child's substantive due process claim could not succeed to the extent it was premised on his removal from his home because the Fourth Amendment addressed that seizure). Jaymz's claim arising from his initial removal is properly analyzed under the Fourth Amendment because it is premised on his seizure and does not coincide with sufficiently separate conduct

involving his relationship with his parents. However, the court seems to have overlooked that Crystelle and Joshua also assert substantive due process claims premised on Jaymz's initial removal. They were not seized; thus, their claims are properly analyzed under substantive due process.

### 1. Jaymz's Initial Removal

"In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers 'have reason to believe that life or limb is in immediate jeopardy.'" *Brokaw*, 235 F.3d at 1010 (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 605 (2d Cir. 1999)); *see also Siliven*, 635 F.3d at 926 (quoting *Brokaw*). Removing Jaymz from his home and parents and taking him into protective custody qualifies as a seizure. *See Brokaw*, 235 F.3d at 1010. Since Jaymz's seizure was not pursuant to a court order and the defendants do not assert that it was justified by exigent circumstances, the seizure must have been supported by probable cause to have been reasonable.

The probable cause analysis is an objective inquiry. *Siliven*, 635 F.3d at 927. The "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child], and whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Id.* We need not decide

whether Jaymz's removal was supported by probable cause, however; we can decide the claim on qualified immunity grounds. As long as a reasonable DCFS investigator, supervisor, and manager "'could have believed [Jaymz's removal] to be lawful, in light of clearly established law and the information [they] possessed,'" the defendants are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641).

The plaintiffs argue that the district court ignored evidence of the totality of the circumstances including facts known to the defendants at the time of Jaymz's removal that refuted the suspicion of abuse. They cite the following: Dr. Kostinsky was a "mandated reporter" and could have taken protective custody of Jaymz without parental consent if she believed that his life or health was in imminent danger; Foster-Stith contacted the hospital and learned that Jaymz had suffered a torus or buckle fracture, a common injury in children; and Foster saw that Jaymz could walk and climb and reported this to Foster-Stith.

Under the Illinois Abused and Neglected Child Reporting Abuse Act, Dr. Kostinsky and Nurse Luebke were "mandated reporters," meaning that if they had "reasonable cause to believe" that a child in their care may have suffered abuse, they had a legal duty to report it to the DCFS. 325 Ill. Comp. Stat. 5/4. And they did notify DCFS about their suspicions of abuse but did not take Jaymz into temporary protective custody, apparently because they did not believe that he was in

imminent danger. In fact, DCFS advised Dr. Kostinsky to release Jaymz to his parents, and the defendants have not asserted that exigent circumstances justified Jaymz's later removal. As for the type of fracture that Jaymz sustained, Foster-Stith did not recall the significance of a buckle fracture, and the plaintiffs do not point to any evidence to establish that Foster or Ruppe appreciated the significance of a buckle fracture in terms of suspected abuse. Foster did observe that Jaymz could walk and climb and reported this to Foster-Stith, and this observation corroborates the parents' suspicion that Jaymz had fallen out of his crib. But it does not explain why the parents initially denied that he could walk and climb. Their seemingly inconsistent statements as to Jaymz's abilities may support a reasonable belief that further investigation is necessary. *Cf. Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 338 (7th Cir. 2010) ("obviously false statements" supported a decision by the police to continue an investigation). We do not intend to imply that Crystelle and Joshua gave intentionally false statements. It is enough that their statements about Jaymz's abilities were reasonably understood to be inconsistent.

The plaintiffs assert that a telephone call to Dr. Kostinsky explaining that Jaymz could walk and climb may have cleared up the concern that prompted the initial call to DCFS. *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986), cited as support, is distinguishable. There, parents were arrested for child neglect, and the arresting officer knew about the children's condition which "weakly supported an inference" of neglect, but he did not question the

parents, the medical personnel who had seen one of the children, or the babysitter who was watching them. *Id.* at 126-27. The officer acted unreasonably in not asking questions; with "[a] few questions" he would have learned that the parents were not guilty of child neglect. *Id.* at 127. We concluded that the officer did not have probable cause to arrest the parents: "A police officer may not close her or his eyes to facts that would help clarify the circumstances of [a seizure]. Reasonable avenues of investigation must be pursued especially when . . . it is unclear whether a crime had even taken place." *Id.* at 128. And the officer was not entitled to immunity because no reasonably well-trained officer would have believed there was probable cause to arrest the parents. *Id.* at 128-29.

Here, in contrast, Foster did conduct an investigation before taking Jaymz into protective custody. She talked to Dr. Kostinksy and Nurse Luebke and visited the Hernandez home where she made her own personal observations and interviewed Crystelle. Foster's home visit led her to report to Foster-Stith that "everything looks fine" and "nothing . . . seems suspicious." Nonetheless, the home visit did not explain away every cause for concern about abuse. Even if Foster's observations of Jaymz cleared up the inconsistency between his reported abilities and the parents' explanation of how he was injured, that was not the only cause for concern. Because Crystelle and Joshua initially reported that Jaymz could not walk or climb when it appeared that he could, a reasonable investigator may have suspected that the parents were trying to hide something

or protect someone by reporting erroneous information. Moreover, that inconsistency was not the only concern that prompted the hotline call. The parents also gave conflicting reports to Dr. Kostinksy and Nurse Luebke about who was home at the time of the incident. Both of these unexplained inconsistencies, together with the seriousness of Jaymz's injury; the older, unexplained bruising above his eyelid; the initial medical screening in the hospital raised reg flags about possible abuse; and the parents' lack of certainty regarding how the injury occurred, could give a reasonable DCFS investigator, supervisor, and manager pause.

The plaintiffs identify three cases to establish that a reasonable official would know that seizing Jaymz under the circumstances violated their clearly established rights: *Doe v. Heck, Michael C. v. Gresbach*, 526 F.3d 1008 (7th Cir. 2008), and *Brokaw*. In *Heck*, we stated that "it is patently unconstitutional for governmental officials to . . . seize a child attending [a private or parochial] school without a warrant or court order, probable cause, consent, or exigent circumstances." 327 F.3d at 517. *Gresbach* stands for another broad proposition: "a search of a child's body under his clothes, on private property" in the absence of consent or any other exception to the warrant requirement violates the child's Fourth Amendment rights. 526 F.3d at 1017. Neither case addresses circumstances like those presented here. Nor would they have put a reasonable official on notice that removing Jaymz from the care and custody of his parents given the above circumstances violated a clearly established constitutional right. *See Ault*, 634 F.3d at 946-

47 (cases standing for broad propositions concerning familial integrity would not have put defendant on notice that she was violating any clearly established constitutional right).

*Brokaw* comes a bit closer, but still falls short. In that case, the plaintiff alleged that he was removed from his home when he was a child without a court order. His relatives had made allegations of child neglect to DCFS and the sheriff's office but no investigation into the allegations—not even a home visit or a conversation with the child—took place. We could not conclude that the unspecified allegations of child neglect established exigent circumstances or probable cause justifying the child's removal. Consequently, we concluded that the plaintiff stated a claim under the Fourth Amendment. *Brokaw*, 235 F.3d at 1011. In this case, the plaintiffs argue based on *Brokaw* that a reasonable investigator would have known that she could not seize a child based solely on a hotline call. They also argue that the defendants acknowledged "they never had more than a hotline call to support the taking of protective custody." The defendants acknowledged that they could not take protective custody based solely on a hotline call—false reports can be made and reports of abuse should be investigated. But they did not agree that their only evidence was the hotline call. And Foster did not remove Jaymz based only on the hotline call. She conducted an investigation into the suspected abuse, interviewing Dr. Kostinsky, Dr. Luebke, and Crystelle and observing Jaymz at home. And some of the bases for suspicions of abuse persisted despite Foster's observations during her home visit.

Similarly, the plaintiffs argue that the district court ignored Foster and Foster-Stith's testimony that *before* Foster arrived at the Hernandez home, they did not have enough evidence to take Jaymz into protective custody. That is beside the point: Jaymz was taken into protective custody *after* Foster visited the home. "The probable cause analysis is an objective one." *Siliven*, 635 F.3d at 927. The "focus is on the facts and circumstances known to defendants at the time they decided to remove [the child.]" *Id.* Whether Foster and Foster-Stith believed they had probable cause to take Jaymz into temporary protective custody before the home visit has little bearing on whether there was probable cause after the visit.

Although this is a close question, we conclude that a reasonable DCFS investigator, supervisor, and manager could have believed that removing Jaymz from his home and family was supported by probable cause given the following facts: (1) fifteen-month-old Jaymz suffered a fractured arm; (2) no one actually observed how he was injured and Jaymz could not verbalize what had happened; (3) Jaymz had an unexplained, older bruise above his left eyelid; (4) Dr. Kostinsky and Nurse Luebke suspected abuse because Jaymz's injury didn't fit with the parents' statements that he could not climb and there was nothing in his crib to climb on; (5) the parents gave conflicting reports about who was home at the time of the incident to Dr. Kostinsky and Nurse Luebke, and one could expect that they would be accurate in reporting what happened to the medical professionals; (6) Crystelle first denied that Jaymz could

walk or climb, but when she was told that DCFS had been contacted, she claimed he could walk but could not climb; (7) Jaymz was observed later that same day to have the ability to walk and climb; and (8) the parents denied that anything was in the crib, but Foster observed objects in the crib. This was enough that under the circumstances a reasonable DCFS official would not have understood that taking Jaymz into temporary protective custody violated his Fourth Amendment rights.

The plaintiffs argue that Foster-Stith is not entitled to qualified immunity because she misrepresented critical facts to Ruppe by stating that the parents had "no explanation" for how Jaymz's injury occurred. The Hernandezes assert that they had an explanation—Jaymz injured himself when he climbed out of his crib—and their explanation was consistent with his injury. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006), cited by plaintiffs in which we held that factual issues precluded summary judgment in favor of arresting officers on qualified immunity grounds, is inapposite. The record in that case supported a finding that the officers "realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing" an arrest. *Id.* at 1016. This raised factual issues about whether the officers reasonably relied on the prosecutor's advice that there was probable cause. *Id.* Although the record does not establish that Ruppe knew Jaymz could walk and climb, it likewise does not support a finding that Foster-Stith misrepresented critical facts to him. Foster-Stith testified that she advised Ruppe that the parents had

no explanation for how Jaymz fractured his arm or for the bruising above his eye. This is not a misrepresentation because it is true that Crystelle and Joshua did not actually observe Jaymz fall out of his crib; they were merely speculating as to how he became injured. And no explanation for the older bruising above his left eyelid was offered. Ruppe's lack of recollection of his conversation with Foster-Stith does not create a genuine issue of fact as to whether Foster-Stith consulted Ruppe given Foster-Stith's testimony. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002).

Based on our review of the record, the defendants are entitled to qualified immunity on Jaymz's Fourth Amendment claim based on taking him into protective custody. Thus, the district court did not err in granting them summary judgment on this claim. In moving for summary judgment, the defendants did not address the parents' substantive due process claims premised on taking Jaymz into protective custody. Nonetheless, these claims stand or fall with Jaymz's Fourth Amendment claim premised on his removal, and we may affirm a grant of summary judgment on any ground supported by the record. *King v. Burlington N. & Santa Fe Ry.*, 538 F.3d 814, 817 (7th Cir. 2008). Because summary judgment was appropriate with respect to Jaymz's Fourth Amendment claim premised on his initial removal, the district court did not err in also granting summary judgment on the parents' substantive due process claims based on his removal.

### 2. Continued Withholding of Jaymz

As noted, the plaintiffs assert substantive due process claims, alleging violations of their right to familial relations. A family's right "to remain together without the coercive interference of the awesome power of the state" is "the most essential and basic aspect of familial privacy." *Heck*, 327 F.3d at 524 (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)). The fundamental right to familial relations is an aspect of substantive due process. *E.g.*, *Siliven*, 635 F.3d at 928. This includes the parents' right "to bear and raise their children" and the child's right "to be raised and nurtured by his parents." *Id.* This right is not absolute, but "must be balanced against the state's interest in protecting children from abuse." *Id.* To achieve the proper balance, caseworkers must have "some definite and articulable evidence giving rise to a reasonable suspicion" of past or imminent danger of abuse before they may take a child into protective custody. *Brokaw*, 235 F.3d at 1019; *see also Siliven*, 635 F.3d at 928. "'A reasonable suspicion requires more than a hunch but less than probable cause.'" *Siliven*, 635 F.3d at 928 (quoting *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010)). The defendants suggest that a "shocks the conscience" standard, *see County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998), is applicable in the context of taking and holding a child in protective custody. We have not used that standard in this context, and our precedent set in *Brokaw* and followed in *Heck* and quite recently in *Siliven* is otherwise.

The plaintiffs argue that the district court erred in granting summary judgment on the substantive due

process claims arising from Jaymz's continued with-holding from the time he was taken into protective custody until the morning of September 10 when the defendants obtained the signed safety plan. The plain-tiffs assert that even if the defendants had reason to believe that probable cause existed to take protective custody on September 8, probable cause dissipated by September 9, but the defendants continued to hold Jaymz and refused to release him to his parents.

The defendants respond by arguing that the plaintiffs are challenging a single seizure, not two separate ones. They further argue that the plaintiffs offer no authority for the proposition that they can assert separate "duration of custody" claims. The defendants over-look *Brokaw*, 235 F.3d at 1018-19, which analyzed a child's claim based on a nearly four-month period of government-forced separation from his parents under substantive due process. *Siliven* offers additional authority, despite our conclusion based on the facts that the child's removal and separation did not violate the plaintiffs' substantive due process rights. *See Siliven*, 635 F.3d at 928. Both the parents and the child in *Siliven* asserted violations of their right to familial rela-tions, a component of substantive due process.

We find additional guidance in *BeVier*, in which an officer arrested parents for child neglect and later was advised by an experienced DCFS investigator that his description of the children's situation did not appear to establish child neglect. Nevertheless, the officer did not release the parents from custody. *BeVier*, 806 F.2d

at 125. We held that he violated the parents' constitutional rights, stating that "[t]he continuation of even a lawful arrest violates . . . [constitutional rights] when the police discover additional facts dissipating their earlier probable cause." *Id.* at 128; *see also Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 975 (7th Cir. 1994) (Cudahy, J., concurring in part and dissenting in part) (asserting that if the evidence serving as the "*sole basis* for detention has evaporated" the plaintiff has stated a due process claim); *Sivard v. Pulaski Cnty.*, 959 F.2d 662, 665 (7th Cir. 1992) (stating that an arrest based on probable cause "does not preclude *all* § 1983 actions for wrongful detentions"). That Jaymz's initial removal and continued holding in temporary protective custody formed one seizure is of little moment. The issue is whether the defendants could have believed that continuing to hold Jaymz in protective custody was lawful. Resolution of this issue turns on the facts and circumstances known to them at the relevant time. As they obtained additional information that eroded any reasonable basis for believing that Jaymz was abused or was in imminent danger of abuse, keeping him in protective custody became unreasonable.

Whether challenged under the Fourth Amendment or substantive due process, the plaintiffs allege that holding Jaymz in protective custody beyond the point that the defendants knew they had no reason to do so violated their constitutional rights. But are the plaintiffs' claims properly analyzed under the Fourth Amendment or substantive due process? In *Heck*, we stated: "[I]f a plaintiff's sole purpose in bringing a familial relations claim

is to recover damages for a physical seizure, then that claim is more appropriately analyzed under the Fourth Amendment. On the other hand, if, . . . a familial relations claim specifically alleges that the government's physical seizure coincided with other conduct amounting to an interference with the parent-child relationship," the plaintiff may also maintain a substantive due process claim. *Heck*, 327 F.3d at 518 n.23 (citation omitted). Jaymz complains about his seizure, specifically including the continued holding of him in protective custody. Other than the passage of time, the harm he complains of is no different than the harm he alleges was caused by his initial removal. He does not assert that any other conduct interfered with his right to familial relations. Therefore, Jaymz's continued withholding claim is analyzed under the Fourth Amendment. Crystelle and Joshua were not seized; their continued withholding claims are properly analyzed under substantive due process.

The evidence raises genuine issues of material fact as to when a reasonable DCFS investigator, supervisor, or manager would have known that the continued withholding of Jaymz violated clearly established constitutional rights. The morning of September 9, orthopedist Dr. Herbstman, who cast Jaymz's arm, informed Foster that the injury "did not look like any abuse or neglect" and that "this type of fracture is a torus type (a little buckle) not from a twisting of the arm . . . [and] is consistent with" a fall from a crib. He also advised that this type of fracture "is sustain[ed] from direct contact and there were no finger marks on [Jaymz's] arm." Although

Dr. Herbstman did not further explain the significance of this last fact, the context raises a reasonable inference that such marks would be expected if the fracture was caused by abuse. Later that day, Jaymz had a full skeletal survey and was examined by Dr. Zirlin, who reported to Foster that other than the fracture, Jaymz's physical exam was normal and there were no clinical or radiographic signs of abuse. The radiologist did not disagree. Foster understood that Dr. Zirlin saw no reason to believe that Jaymz had been abused and, like Dr. Herbstman, believed the fracture was consistent with a fall from a crib. Furthermore, the assistant state's attorney had told Foster that there was not enough to file a petition; they did not have evidence of an "immediate and urgent [need to remove a child]." Foster apparently relayed at least the state's attorney's opinion to Foster-Stith, who conveyed it to Ruppe that afternoon. Finally, Foster advised Crystelle that protective custody had lapsed and there would be no court hearing because there was not enough evidence of abuse.

The record raises a genuine issue as to when on September 9 probable cause dissipated and the defendants no longer had a reasonable suspicion that Jaymz had been abused or was in imminent danger of abuse. At that time, the state had no interest in keeping him in protective custody and away from his parents. *See Brokaw*, 235 F.3d at 1019. Nonetheless, the defendants continued to hold Jaymz in protective custody and he was not released to his parents. And Foster told Crystelle that everything had to stay the same just because the forty-

eight hours wasn't up—she couldn't even go see Jaymz. The evidence raises a genuine dispute of fact about whether a reasonable person in the defendants' positions would have understood that continuing to hold Jaymz in protective custody violated the plaintiffs' clearly established constitutional rights.

The defendants argue that Illinois law authorizes them to keep a child in temporary protective custody for a full forty-eight hours. The federal Constitution is the supreme law of the land; state law cannot trump federal constitutional rights. U.S. Const. art. VI, cl. 2. Even if it could, the Illinois Juvenile Court Act does not provide the state with blanket authority to hold a child in protective custody regardless of the circumstances, specifically where probable cause and reasonable suspicion have dissipated. Rather, the Act requires that "[u]nless sooner released, a minor . . . taken into temporary protective custody must be brought before a judicial officer within 48 hours . . . for a temporary custody hearing . . . ." 705 Ill. Comp. Stat. 405/2-9(1). Thus, the Act contemplates cases in which a minor may be released before he is brought before a judicial officer, and before the expiration of the forty-eight-hour period. Such cases would include those in which the discovery of additional facts dissipated the probable cause to hold a child in temporary protective custody. That is precisely this case. Probable cause is determined on the basis of the facts and circumstances known to the defendants at the time of the conduct in issue, *see Siliven*, 635 F.3d at 927, whether it is the child's removal or the decision to continue holding a child in protective custody. The de-

fendants' assertion that they could keep Jaymz in pro-
tective custody for up to forty-eight hours regardless
of what came to be known to them in the meantime
cannot be reconciled with the probable cause analysis.

And *Gerstein v. Pugh*, 420 U.S. 103 (1975), *County of
Riverside v. McLaughlin*, 500 U.S. 44 (1991), and *Brokaw*
do not authorize a child's detention for at least forty-
eight hours just because a warrantless seizure of the
child was based on probable cause. Nor do they entitle
the defendants to qualified immunity on the continued
withholding claims. *Gerstein* and *McLaughlin* did not
involve a child's removal and taking into protective
custody; they addressed the Fourth Amendment's re-
quirement of a prompt judicial determination of probable
cause following an arrest without a warrant. *McLaughlin*,
500 U.S. at 53; *Gerstein*, 420 U.S. at 114. Neither case
stands for the proposition that a person who is seized
based on probable cause may be detained for up to forty-
eight hours, or any other period for that matter, notwith-
standing the dissipation of probable cause. Similarly,
*Brokaw* does not address a forty-eight-hour outer limit.
Nor does it suggest that the state may retain custody of
a child for up to forty-eight hours where probable
cause and even reasonable suspicion no longer exist.

Therefore, the district court erred in concluding that
the defendants were entitled to qualified immunity on
Jaymz's Fourth Amendment continued withholding
claim and the parents' substantive due process con-
tinued withholding claims.

### 3. Coerced Safety Plan

The plaintiffs also raise substantive due process claims against all three defendants based on the safety plan. The state may, instead of immediately removing a child from his parents, offer the parents the option of agreeing to a "safety plan," which imposes certain restrictions pending completion of the state's investigation into suspected abuse. For example, a safety plan may require that a child be sent to live with other family members. *Dupuy v. Samuels*, 465 F.3d 757, 760 (7th Cir. 2006). Although such restrictions on familial rights are "less extreme than removing the child from parental custody altogether, . . . they may be invasive enough to count as deprivations of liberty, thus triggering the right to a hearing." *Id.* We have likened a safety plan to an interim settlement agreement, stating that "the decision to agree to a safety plan is optional with the parents." *Id.* at 761. In *Dupuy*, we concluded that there is no right to a hearing before the parents are offered a safety plan. *Id.* We reasoned:

> Parents are entitled to a hearing if their parental rights are impaired, but the offer of a settlement [does not] impair[] those rights. . . .
>
> . . . .
>
> . . . Because the safety plan is voluntary, no hearing of any kind is necessary; hearings are required for deprivations ordered over objection, not for steps authorized by consent.

*Id.* at 761-62. We added that "[i]t is not a forbidden means of 'coercing' a settlement to threaten merely to enforce

one's legal [authority]." *Id.* at 762. However, it is improper to obtain consent to a safety plan through duress or other illegal means. *See id.* at 762-63. Exerting pressure "to obtain a result to which the party applying the pressure had no right" is an example of duress. *Id.* at 763.

In *Dupuy*, we distinguished *Doe v. Heck*, which held that the state agency violated the family's constitutional right to familial relations by merely threatening parents with removing their children from their custody. The state agency had no lawful authority to make the threat in *Heck*; in contrast, in *Dupuy*, there was no suggestion that the agency offered a safety plan without a suspicion of neglect or abuse. *See id.* at 762-63 (citing *Heck*, 327 F.3d at 524-25). *Dupuy* also distinguished *Croft v. Westmoreland County Children & Youth Services*, 103 F.3d 1123 (3d Cir. 1997), in which a caseworker who suspected a father of child abuse but had no objective evidence threatened to place the child in foster care if the father did not leave the home. *See Croft*, 103 F.3d at 1127. Thus, the "threat was not grounded in proper legal authority." *Dupuy*, 465 F.3d at 763. *Dupuy* represents lawful threats, whereas *Heck* and *Croft* exemplify threats not grounded in proper legal authority. And as we know from *Brokaw*, in the context of protecting a child from his parents, "proper legal authority" means "some definite and articulable evidence giving rise to a reasonable suspicion" of past or imminent danger of abuse. *Brokaw*, 235 F.3d at 1019.

Focusing on the particular facts in each of these cases, the defendants overlook the broader propositions for

which they stand: where an official makes a threat to
take an action that she has no legal authority to take,
that is duress; and it is improper to obtain consent to a
safety plan through duress or other illegal means. Ac-
cording to Crystelle, Foster presented the safety plan to
them and said that once they signed it, they could see
Jaymz, but they "couldn't be alone with him or take
him anywhere . . . can't be unsupervised. My grammy
still has the custody over him; . . . I don't have . . . my
parental rights." Crystelle stated that Foster informed
them that "[i]f we didn't sign it [the safety plan], we
couldn't see him." When Foster presented the safety
plan to Crystelle and Joshua the morning of September 10,
however, she could have had no reasonable suspicion
that Jaymz had been abused or was in imminent danger
of abuse. She therefore had no proper legal authority to
tell them that they could not see Jaymz or exercise
other parental custody rights unless they agreed to a
safety plan. *See Dupuy*, 465 F.3d at 763 (agency had no
right to threaten removing child from parents' custody
where it did not suspect the parents of child abuse).

The district court determined that in context Foster's
statements could not reasonably be construed as threats
or coercion. But a threat that parents cannot see their
child unless they agree to something is extremely co-
ercive. *See, e.g., Siliven*, 635 F.3d at 926 (evidence that
defendants coerced mother into taking her child to her
grandmother's house by threatening to place him in
foster care if she didn't cooperate with investigation);
*Croft*, 103 F.3d at 1125 n.1 ("The threat that unless Dr. Croft
left his home, the state would take his four-year-old

daughter and place her in foster care was blatantly coer-cive."). In the context of removing a child from his home and family, we have observed that "'[a] threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance.'" *Siliven*, 635 F.3d at 926 (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1179 (7th Cir. 1994)). Indeed, "it is difficult to overstate the cost of non-compliance—losing custody of one's child, even temporarily." *Id.* At oral argument, counsel for defendants persisted in ignoring a material fact in this case: Crystelle and Joshua did not have custody of Jaymz when Foster "offered" the safety plan to them and represented that if they didn't sign the plan, they couldn't even see Jaymz. It is one thing for parents to question a caseworker's authority to impose a safety plan when they have custody of their child; it is entirely another when the parents don't have custody. In the former situation, the parents' resistance may create the risk that the child will be taken away from them, whereas in the latter, the child has already been removed—the risk is certain. Defense counsel failed to appreciate this critical difference. In asserting that it was not rea-sonable for the Hernandezes to sign the safety plan with-out reading it or questioning Foster's authority, despite "knowing" that temporary custody would end within a few hours and no court hearing would be held, the de-fendants fail to view the facts and reasonable inferences in favor of the plaintiffs, as we and the district court must. The record raises a genuine issue of fact as to whether Crystelle and Joshua were coerced into signing the safety plan.

According to the defendants, Crystelle and Joshua had an effective legal remedy—a hearing within forty-eight hours of removal. But this ignores evidence that Foster told Crystelle the day before that there would be no hearing, no petition would be filed, and that protective custody would be allowed to lapse. The defendants seem to advocate a standard under which parents in the Hernandezes' position should mistrust what a DCFS investigator says to them. That is an odd position to take. In addition, the record does not suggest that Foster's statement that Crystelle and Joshua had to sign the safety plan if they wanted to see Jaymz was qualified in any manner. For example, nothing suggests that Foster limited her statement that they had no custody rights and could not see Jaymz "at this moment." But even if that would have satisfied due process, which it wouldn't, no such qualification was provided here.

In arguing that the parents were not coerced into agreeing to the safety plan, the defendants cite *Terry v. Richardson*, 346 F.3d 781 (7th Cir. 2003), where a noncustodial father alleged that a DCFS investigator interfered with his substantive due process rights by interfering with his interest in visitation with his child. The father was suspected of sexual abuse of his child, and a DCFS investigator advised him that he was to cease all visitation and contact with his child during the investigation. *See id.* at 782-83. We determined that "a reasonable person with the resources available to [the father], would not have left [the investigator's] authority unquestioned[.]" *Id.* at 785. Importantly, the father had a chance to speak to the investigator about the scope of her author-

ity and within two weeks of their conversation, he had met with an attorney. *Id.* This case, however, is quite different. The plaintiffs have presented evidence that Foster threatened Crystelle and Joshua that they could not even see Jaymz if they did not sign the safety plan *after* suspicions of abuse had dissipated. At the time, the parents had not consulted a lawyer and Jaymz had already been taken from their custody. Under these circumstances, a reasonable person may not have risked questioning Foster's authority because their custodial rights had already been taken from them.

*Dupuy* gave the defendants fair notice that threatening to take action that they had no legal authority to take is improper and violates familial rights. *Dupuy*, 465 F.3d at 763. The plaintiffs have raised a genuine issue of material fact as to whether a reasonable parent in Crystelle and Joshua's position would have questioned Foster's authority and whether their agreement to the safety plan was coerced. And any reasonable DCFS investigator, supervisor, or manager would know that threatening Crystelle and Joshua, as they allege they were threatened, without even a reasonable suspicion of abuse to get them to agree to the safety plan violated the plaintiffs' constitutional rights. Thus, the district court erred in granting summary judgment on the substantive due process claims related to the coerced safety plan.

## C.  Procedural Due Process

All plaintiffs in this case bring procedural due process claims, alleging that the defendants violated their due

process rights by taking protective custody of Jaymz in the absence of an emergency or pre-deprivation hearing and coercing Crystelle and Joshua into accepting the safety plan. The plaintiffs point out that in moving for summary judgment, the defendants did not challenge the procedural due process claims premised on Jaymz's initial removal. Although generally the district court should not base summary judgment on grounds not raised by the moving party, s*ee Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006), "we may affirm on any ground supported in the record, so long as it has been adequately presented below." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 n.2 (7th Cir. 2010). The reason for this: "[I]f the issue is not raised below, the nonmovant has no obligation to present evidence on the point." *Id.*

The defendants did not expressly seek summary judgment on the procedural due process claims stemming from Jaymz's initial removal. (Their summary judgment motion asserted that they were entitled to qualified immunity on the claimed procedural due process violation. *See* Suppl. App. 179.) However, the plaintiffs' opposition brief argued that they were denied procedural due process in part because they were afforded no hearing either before Jaymz's removal or while he was in protective custody. *See id.* at 229. The plaintiffs also argued that the defendants were not entitled to qualified immunity as against the procedural due process violations. *Id.* at 229-30. And the plaintiffs have not asserted that they have any evidence pertaining to their procedural due process claims that wasn't presented in the district court. Therefore, we consider whether the defendants are

entitled to summary judgment on the due process claims premised on Jaymz's initial removal.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "The amount and timing of the process due . . . varies with circumstances." *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (citing *Mathews*, 424 U.S. at 335)). We stated in *Brokaw*, long before the events at issue in this case, that due process "at a minimum . . . requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents" and "also means that governmental officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances." *Brokaw*, 235 F.3d at 1020.

The plaintiffs assert that *Brokaw* placed any reasonable DCFS investigator, supervisor, or manager on notice that taking Jaymz into temporary custody without a hearing, absent exigent circumstances, violated the plaintiffs' procedural due process rights.[1] We disagree.

---

[1] The Illinois Abused and Neglected Child Reporting Act and Illinois administrative code provide notice that a hearing and court order was necessary under state law. *See* 325 Ill. Comp. Stat. 5/5; Ill. Admin. Code tit. 89, § 300.120. A violation of the state law does not necessarily establish a federal due process

(continued...)

First, in *Brokaw* we concluded that "[b]ecause [the plaintiff] claims that he was removed based on knowingly false statements of child neglect, and that the defendants removed him from his home without an investigation, a pre-deprivation hearing, or exigent circumstances, he has stated a procedural due process claim[.]" 235 F.3d at 1021. Thus, the conclusion that the plaintiff stated a due process claim was not based solely on the absence of a predeprivation hearing and exigent circumstances. It is a bit unclear whether the plaintiff still would have stated a claim if he had not alleged that he was removed based on misrepresentations.

Furthermore, our decisions contain conflicting language regarding when a pre-deprivation hearing is required before a child's removal. For example, in *Jensen v. Foley*, 295 F.3d 745 (7th Cir. 2002), decided almost two years after *Brokaw*, we stated:

> So long as a post-deprivation hearing is held within 2 business days of removal, DCFS agents constitutionally may remove a child from her home and family without a pre-deprivation hearing if they are acting pursuant to a court order, if the taking is supported by probable cause to believe that the child would be subject to

---

[1] (...continued)

claim. *See, e.g.*, *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 666 (7th Cir. 2005) ("State law does not create duties under the federal constitution, and violations of state law are by themselves insufficient to impose liability under § 1983.").

the danger of abuse if not removed, or if exigent circumstances require them to do so.

*Id.* at 747 (citing *Brokaw*, 235 F.3d at 1010). It is true that *Jensen* cites to *Brokaw*'s analysis of the Fourth Amendment seizure claim, not the procedural due process claim, and whether a seizure is substantively reasonable under the Fourth Amendment is independent of the question of what process is due. *Compare Brokaw*, 235 F.3d at 1010, *with id.* at 1020. But the language quoted from *Jensen* appears in the context of addressing both Fourth and Fourteenth Amendment rights and is unaccompanied by any indication that it is limited to one context or the other. Moreover, in *Jensen* we determined that the plaintiffs' constitutional claims—without any qualification and thus including the procedural due process claims—"could succeed only if *no* probable cause existed." *Jensen*, 295 F.3d at 748.

When *Jensen* is understood in its factual context, however, it is consonant with *Brokaw*. In *Jensen*, the state court found at a temporary custody hearing that there was probable cause to believe that the removed child was at risk of physical harm in her home *and* that keeping her out of her father's custody was "a matter of immediate and urgent necessity." *Id.* Thus, in essence the state court found exigent circumstances, *cf. Doe v. Kearney*, 329 F.3d 1286, 1294 n.10 (11th Cir. 2003) (treating "emergency" as synonymous with "exigency" and "imminent danger"), which justified the child's removal without a pre-deprivation hearing.

Another decision containing ambiguous language regarding a pre-removal hearing requirement is *Lossman v. Pekarske*, 707 F.2d 288 (7th Cir. 1983). There, we considered whether a father and his children were denied due process when the children were removed from the father's custody based on an ex parte order. We said that "[w]hen a child's safety is threatened, that is justification enough for action first and hearing afterward." *Id.* at 291. This seems to be an implicit appeal to exigent circumstances, but the language is broad and arguably reaches situations in addition to those in which a child is in imminent danger.

We think it asks too much of reasonable child protection workers to expect them to conduct nuanced legal analysis of the situations they face in the field. Nor do we expect reasonable child protection workers to parse the language of our case law along such fine lines as we have just done. The conflicting language in our decisions may have left them with uncertainty about the procedural due process consequences of the situation confronted in our case.

When read together, our cases such as *Brokaw* and *Jensen*, imply that government officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse. Our sister circuits are in accord with this view. *See, e.g., Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006) (collecting cases); *Kearney*, 329 F.3d at 1295-96 (same). It does not suffice for the official to have probable cause merely to believe

that the child was abused or neglected, or is in a general danger of future abuse or neglect. The danger must be imminent, or put another way, the circumstances must be exigent.

At the time of Jaymz's removal, our case law did not put a reasonable DCFS investigator, supervisor, or manager on notice that removing Jaymz without a pre-deprivation hearing violated the plaintiffs' clearly established procedural due process rights. *Jensen* had indicated that the removal was lawful as long as there was probable cause to believe that Jaymz would be subject to the danger of abuse if not removed, and a post-deprivation hearing was held within two business days. We have concluded that a reasonable DCFS worker could have believed there was probable cause to remove Jaymz. No hearing was held in this case, but the defendants did not know at the time of removal that there would be no hearing. And the parents ultimately signed a safety plan before the end of the second day. (We address the procedural due process concerns that arise from the safety plan below.) As we have stated, "the amount of process due varies with the particular situation[.]" *Brokaw*, 235 F.3d at 1020. It is not insignificant that Jaymz was taken into temporary protective custody and placed with family members, and his parents were allowed some minimal contact with him, all of which lessened the intrusion on the family's rights. Therefore, the defendants are entitled to qualified immunity on the due process claim arising from Jaymz's initial removal. But the process due with respect to the allegedly coerced safety plan is another matter.

Due process "requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020. This conclusion applies equally in the context of obtaining parental consent to a restrictive safety plan. Under *Dupuy*, the state may not threaten to infringe parental custody rights when the state has no legal right to carry through on the threat. *See Dupuy*, 465 F.3d at 761-63. If Foster misrepresented the facts and Crystelle's and Joshua's legal rights in order to obtain their consent to the safety plan, their agreement to the safety plan was not voluntary and they were illegally coerced into signing the plan. Hence, they would have been denied due process. *Id.* at 761-62 ("[H]earings are required for deprivations ordered over objection . . . ."). The plaintiffs have created a triable issue as to whether a reasonable parent in their situation would have felt free to refuse to sign the safety plan. Therefore, they have enough evidence to raise a genuine issue as to whether they were coerced into agreeing to the safety plan.

Arguing that Crystelle and Joshua had no constitutional right to a pre-safety plan hearing and that Illinois law provided sufficient post-safety plan procedural safeguards, the defendants cite *Terry v. Richardson*, which held that a DCFS investigator's failure to give a father notice and a hearing before or immediately after she told him not to visit his child during a child abuse investigation did not violate procedural due process. *Terry*, 346 F.3d at 786-87. The deprivation in *Terry* was very minor, resulting in a one-day interference with a

noncustodial parent's right to visit his child. *Id.* at 786. As we know, "the amount of process due varies with the particular situation." *Brokaw*, 235 F.3d at 1020; *see also Terry*, 346 F.3d at 786 ("Where the loss is small, due process does not require elaborate procedures in advance."). The deprivation in *Terry* was different in kind from the deprivations Crystelle and Joshua allege—that they couldn't see Jaymz and had no custody rights unless they signed the safety plan. Due process demands greater protections for them. That they did not request a hearing is no defense to their claims. *See K.D. v. County of Crow Wing*, 434 F.3d 1051, 1056 n.6 (8th Cir. 2006) ("Once a child is removed from parental custody without a court order, the state bears the burden to initiate prompt judicial proceedings to provide a post deprivation hearing.").

## D. Personal Liability

Each defendant is sued in his or her individual capacity with respect to each count of the complaint. " '[T]o establish personal liability in a § 1983 action, the plaintiff must show that the government officer caused the deprivation of a federal right.' " *Brokaw*, 235 F.3d at 1012 (quoting *Luck v. Rovenstine*, 168 F.3d 323, 327 (7th Cir. 1999)). "An official causes a constitutional violation if he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Id.*

Foster removed Jaymz from his home, took him into protective custody, and obtained the parents' agree-

ment to the safety plans. Foster-Stith and Ruppe authorized Jaymz's removal and approved taking him into protective custody. They also directed Foster to obtain the parents' agreement to the first safety plan and approved that plan. Foster-Stith and Foster discussed updating that plan; Foster-Stith later approved the second plan. However, Ruppe's involvement, if any, in the second safety plan is unclear.

The defendants argue that the plaintiffs have presented no evidence that anyone other than Foster was personally involved in the threats allegedly made in connection with the safety plan. The plaintiffs offer no reply. But this argument was not raised until this appeal. The defendants' failure to raise this argument before the district court waives the argument on appeal. *See Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002). We leave the determination of whether Foster-Stith or Ruppe may be held liable on the safety plan coercion claims to the district court upon further development of the record.

### III. Conclusion

For the foregoing reasons, the grant of summary judgment is AFFIRMED with respect to the Fourth Amendment, substantive due process, and procedural due process claims premised on Jaymz's initial removal, and VACATED with respect to the Fourth Amendment and substantive due process claims premised on the continued withholding of Jaymz as well as the substantive due process

and procedural due process claims premised on the safety plan. This case is REMANDED to the district court for proceedings consistent with this opinion.