In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2701

MARK SILIVEN, et al.,

*Plaintiffs-Appellants,*

*v.*

INDIANA DEPARTMENT OF CHILD SERVICES, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-1192-WTL-DML—**William T. Lawrence**, *Judge.*

ARGUED JANUARY 21, 2011—DECIDED MARCH 16, 2011

Before FLAUM, MANION, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* In January 2008, Teresa Siliven discovered bruises on her then-two-year-old son C.S.'s arm a few hours after picking him up from daycare at the home of Ashley Woods. Teresa's husband Mark told her that he did not know how C.S. had gotten the bruises. The Silivens filed a child abuse report with the police. The case was referred to the Indiana Department of Child Services ("DCS"), and assigned to case manager

Amber Luedike. Towards the end of an eight-day investigation into both Woods and the Silivens, Luedike discovered a DCS file indicating that Mark had been accused of child abuse by his then-fifteen-year-old stepdaughter in 2003. The day after Luedike discovered the report, she and Terry Suttle, the director of the Wayne County DCS, decided to remove C.S. from the Siliven home. They did not obtain a court order as it was Friday afternoon, and they did not believe there was adequate time to do so. Instead of putting C.S. in foster care, Luedike and Suttle ultimately arranged to have Teresa take C.S. to his grandmother's house in Ohio. A detention hearing was held the following Monday, after which the court concluded that no probable cause existed at that time to believe that C.S.'s physical health was seriously endangered. The Silivens were permitted to take C.S. home. Soon thereafter, the investigation was closed.

The Silivens filed suit against Luedike, Suttle, and the Indiana DCS, alleging constitutional and state law violations. The district court concluded that Suttle and Luedike (the only defendants at issue on appeal) were entitled to summary judgment on the federal claims on qualified immunity grounds, finding that the constitutional rights allegedly violated were not clearly established in January 2008. For the following reasons, we affirm the judgment of the district court.

## I. Background

The Silivens began taking their son C.S. to a daycare run by Ashley Woods in early 2007. By January 2008,

Woods and her husband had begun having some difficulty with C.S., and C.S. would cry when Teresa dropped him off in the morning. However, the Silivens had not seriously considered finding another daycare.

When Teresa picked up C.S. from daycare on January 16, 2008, Woods told her that C.S. had acted up in the afternoon and had to be put in "time out." While Teresa was undressing C.S. that night she noticed bruises on his arm. C.S. said that the bruises did not hurt, and that he did not know how he had gotten them. The Silivens took C.S. to the Richmond Police Department ("RPD") that night and filed a child abuse report.

The report of abuse was referred to the DCS. On January 18, 2008, DCS case manager Luedike visited the Siliven home. At the time, Mark was at home with C.S. Mark told Luedike that he was not currently working due to a disability, and that he would be caring for C.S. at home until the matter was settled. Mark explained the incident to Luedike, who, after observing C.S., noted that the child appeared happy and healthy. Later that day, Luedike called Teresa, who also explained the incident. Luedike asked Teresa to take C.S. to the hospital to have the bruises examined. That evening, the Silivens took C.S. to the emergency room at Reid Hospital.

Luedike obtained a copy of the emergency room doctor's medical report on January 23. The report did not reach any conclusion as to the cause of the bruises. Also on that day, Luedike e-mailed photographs of C.S.'s bruises taken by the police and the Reid

Hospital medical report to Dr. Toni Laskey at the child abuse clinic at Riley Hospital in Indianapolis. The following day, Dr. Laskey responded, opining that the bruises were consistent with an adult forcibly grabbing C.S.'s arm.

Luedike and the police officer assigned to the case, Detective Michael Britt, interviewed Woods on January 23. Woods told them that she did not grab C.S.'s arm, and did not know how he had gotten the bruises. Woods had no criminal history or complaints against her previously. During the interview, Woods provided Luedike with the names and phone numbers of the parents of other children in her daycare. On January 25, Luedike spoke with one of those parents, who stated that Woods took good care of her child and that she had never had any problems with Woods in the nine years that she had known her.

On January 24, Luedike obtained a copy of a 2003 DCS file describing a "substantiated" report of child abuse involving Mark and his then-fifteen-year-old stepdaughter. The DCS uses the term "substantiated" in reference to a child abuse report to mean that the investigation uncovered facts that "provide a preponderance of evidence that child abuse . . . has occurred." Ind. Code § 31-9-2-123. That file contained pictures showing significant bruising to the girl's face, neck, and back.

On January 24 or 25, Luedike contacted Teresa at work to ask whether she and Mark would be willing to take polygraph tests. Teresa agreed to submit to a polygraph, and said she would ask Mark if he would as

well. Later that day, Mark left a message for Luedike in which he agreed to a polygraph, on the condition that Woods and her husband also be tested. According to Luedike, in the message, Mark sounded "very angry and almost threatening."

That afternoon, Luedike met with Suttle, Helen Shultz (Luedike's supervisor), and Aaron Lawson (the staff attorney for the Wayne County DCS) to discuss her investigation. Luedike explained that C.S. had (likely) been injured by an adult and that, because the parents had not been ruled out as having caused the injuries, she could not say that C.S. was safe at home. Luedike recommended that C.S. be removed from the home, and the others agreed. Suttle determined that there was not enough time to obtain a court order before the weekend, and authorized Luedike to remove C.S. from the home pursuant to an emergency detention.

Luedike contacted the Wayne County Sheriff's Department, and three or four Wayne County sheriffs' deputies accompanied her to the Silivens' home. Mark was home with C.S. Luedike told Mark that DCS was going to take C.S. into protective custody. Mark refused to let Luedike into the home or to allow her to take C.S. He called Teresa, who was on her way home from work. Eventually, Teresa spoke with Suttle, who agreed to allow Teresa to take C.S. to his grandmother's house in Ohio in lieu of putting C.S. in foster care. Luedike wrote up a safety plan detailing the arrangement, which the Silivens signed. Teresa and C.S. then drove to Ohio, where they stayed for the weekend.

On Monday, January 28, 2008, a detention hearing was held, after which the judge concluded that no probable cause existed at that time to believe that C.S.'s physical health was seriously endangered, as the applicable statute requires. *See* Ind. Code §§ 31-34-1-2(a), 31-34-2-3(a)(1) (authorizing caseworkers to take children into custody where there is probable cause to believe the child's physical or mental condition will be seriously impaired or seriously endangered if the child is not immediately taken into custody). Therefore, the Silivens were permitted to take C.S. home with them. The investigation was closed on March 18, 2008, and no charges were brought.

The Silivens filed suit against Luedike, Suttle, and the Indiana DCS in Indiana state court, alleging constitutional and state law violations. After defendants removed the action to federal court, the district court granted summary judgment in favor of defendants as to the federal claims. The court also denied the Silivens' cross-motion for summary judgment. With respect to the Indiana DCS, the court granted summary judgment on the ground that the DCS is not a "person" as defined by § 1983, such that the Silivens' claims failed as a matter of law. The Silivens do not appeal that ruling. The court found that Suttle and Luedike were entitled to summary judgment on the federal claims on qualified immunity grounds. The district court elected to bypass the first prong of the two-part qualified immunity analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), as is permissible under *Pearson v. Callahan*, 555 U.S. 223 (2009). Therefore, the court did not decide whether de-

fendants' conduct violated the Silivens' constitutional rights. Instead, the court went directly to the second prong and concluded that the constitutional rights allegedly violated were not "clearly established" in January 2008. Finally, the district court declined to exercise supplemental jurisdiction over the Silivens' remaining state law claims, which it remanded to state court. Subsequently, the Silivens filed a motion to alter or amend judgment; the district court denied that motion. This timely appeal followed.

## II. Discussion

We review a district court's decision on cross-motions for summary judgment de novo, construing all inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004). Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). We similarly review a district court's qualified immunity determination de novo. *Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001).

The doctrine of qualified immunity insulates government actors from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009). In other words, the

doctrine protects public officials "who act in ways they reasonably believe to be lawful," and thus leaves "ample room for mistaken judgments." *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted).

Qualified immunity claims present two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 129 S.Ct. at 815. Courts are free "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818. Unlike the district court, we begin with the first prong, which we find to be dispositive as to each of the Silivens' constitutional claims. *See Williams v. Fleming*, 597 F.3d 820, 823 (7th Cir.2010) (we may affirm the judgment of the district court on any ground supported in the record).

## A. Fourth Amendment Claim

The Silivens first claim that defendants violated C.S.'s Fourth Amendment right to be free from unreasonable seizures when they compelled Teresa to remove the boy from his home. With respect to Fourth Amendment claims asserted "[i]n the context of removing a child from his home and family," we have held that "a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers

'have reason to believe that life or limb is in immediate jeopardy.'" *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000) (citations omitted).

As an initial matter, we must address whether C.S. was seized for purposes of the Fourth Amendment. Generally, a person has been seized for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) (citations omitted). "Determining whether a seizure has occurred is a highly fact-bound inquiry." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008). Among the relevant factors to be considered is "coercive conduct on the part of the police that indicates cooperation is required." *Id.*

Defendants contend that no seizure took place because C.S. was not placed in foster care. Rather, defendants permitted his mother to take him to his grandmother's house and to remain there with him. That C.S. was never out of his mother's company certainly undermines the Fourth Amendment claim. That said, there is evidence indicating that defendants coerced Teresa into taking C.S. to Ohio by threatening to place him in foster care if she did not cooperate. In the context of Fourth Amendment seizures involving official coercion, we have noted that "[a] threat becomes more coercive as the cost of non-compliance increases relative to the cost of compliance." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1179 (7th Cir. 1994). Here, it is difficult to

overstate the cost of non-compliance—losing custody of one's child, even temporarily. But we need not decide whether C.S. was seized within the meaning of the Fourth Amendment. During the January 28 detention hearing, both the DCS and the presiding judge assumed that the events of January 25 constituted an emergency detention. Specifically, Luedike stated at the hearing that C.S. was "detained Friday, January 2[5]th, approximately five p.m.," and the judge noted that the hearing was being held within 48 hours of the removal as required by Indiana law. We too will proceed as if there was an emergency detention, which constitutes a seizure for purposes of the Fourth Amendment.

Assuming there was a seizure, the question is whether defendants acted reasonably. Because defendants acted without a court order, the removal of C.S. can be considered reasonable only if defendants had probable cause or if exigent circumstances existed.[1] We conclude

---

[1] The Silivens argue that, after our decision in *Michael C. v. Gresbach*, 526 F.3d 1008 (7th Cir. 2008), either a court order or exigent circumstances are required, and that probable cause is insufficient. We disagree. In *Michael C.*, we stated that "[t]he requirement that a child welfare worker obtain the equivalent of a warrant before conducting a search (absent exigent circumstances) can effectively protect children, without having to excuse workers from obtaining advance judicial approval of searches and seizures. . . . Because Gresbach conducted a search of each child on private property without consent, a warrant or probable cause, or exigent circumstances, Ian and

(continued...)

that probable cause existed to remove C.S. from Mark's custody, such that there was no Fourth Amendment violation.

The Indiana Code provides that a "child may be taken into custody by a . . . caseworker acting with probable cause to believe the child is a child in need of services if  . . . it appears that the child's physical or mental condition will be seriously impaired or seriously endangered if the child is not immediately taken into custody." Ind. Code § 31-34-2-3(a)(1). A child is considered to be "in need of services" if "the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian." *Id.* § 31-34-1-2(a). The pertinent inquiry, then, is whether defendants had probable cause to believe that C.S.'s physical health would be seriously endangered if he was not immediately removed from his father's custody.

The probable cause analysis is an objective one. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Our focus is on the facts and circumstances known to defendants at the time they decided to remove C.S., and whether a

---

[1] (...continued)

Alexis's Fourth Amendment rights to be free from unreasonable searches were violated." 526 F.3d at 1016. While we omitted mention of probable cause in the first quoted sentence, we included it in the second. We cannot agree that the initial omission implicitly overturned part of the holding in *Brokaw*.

prudent caseworker (meaning one of reasonable cau-
tion) could have believed that C.S. faced an immediate
threat of abuse based on those facts. *Wagner v. Washington
County*, 493 F.3d 833, 836 (7th Cir. 2007) (describing
probable cause in the context of an arrest). The defen-
dants' "subjective beliefs are largely irrelevant to the
probable cause inquiry." *United States v. Garcia-Garcia*,
2011 WL 206153, at *3 (7th Cir. Jan. 25, 2011).

Here, defendants knew that there was physical
evidence of abuse (corroborated by Dr. Laskey's opinion),
that Mark had access to C.S. during the timeframe in
which the injuries might have occurred, and that there
was a prior substantiated report of child abuse against
Mark. We conclude that those facts were sufficient to
warrant a prudent caseworker in believing that C.S. was
in danger. As the Silivens note, the evidence was far
from conclusive as to how C.S. was injured, and
whether Mark was involved. But, while probable cause
requires more than bare suspicion, it does not demand
probability, or "even a showing that the officer's belief
is more likely true than false." *Woods v. City of Chicago*,
234 F.3d 979, 996 (7th Cir. 2000) (internal citations omit-
ted). Moreover, probable cause "need not be based on
evidence sufficient to support a conviction." *Id.* (citation
omitted).

We note that Luedike stated in her deposition that
she did *not* believe C.S. was in imminent danger. Rather,
she simply "couldn't say that he was completely safe."
Because probable cause is judged by an objective stand-
ard, Luedike's "subjective belief as to the legal basis

for [the detention] is irrelevant." *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1113 (7th Cir. 1997). A reasonable caseworker in Luedike's position could have concluded that C.S. was in imminent danger. Therefore, we conclude that defendants' actions were objectively reasonable, and did not violate the Fourth Amendment.

Our determination of reasonableness is influenced, in large part, by the fact that C.S. remained with his mother at all relevant times. Reasonableness under the Fourth Amendment is "measured in light of the totality of the circumstances and determined by balancing the degree to which a challenged action intrudes on an individual's privacy and the degree to which the action promotes a legitimate government interest." *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (in conducting the Fourth Amendment balancing test, "[c]ourts must consider the scope of the particular intrusion . . ."). Here, defendants opted for a less intrusive interference with C.S.'s rights by permitting him to remain with his mother, instead of taking him into state custody. We do not intend to characterize the degree of interference as minimal, far from it. But we believe the state's legitimate interest in protecting children warranted that lesser degree of intrusion in this case.

## B.  Substantive Due Process Claim

The Silivens also present a substantive due process claim. As we noted in *Brokaw*, "[t]he Supreme Court has long recognized as a component of substantive due

process the right to familial relations." 235 F.3d at 1018. That fundamental right encompasses "the right of a man and woman to marry, and to bear and raise their children," as well as "the right of a child to be raised and nurtured by his parents." *Doe v. Heck*, 327 F.3d 492, 517-18 (7th Cir. 2003) (citations omitted). The constitutional right to familial integrity is not absolute; rather, it must be balanced against the state's interest in protecting children from abuse. *Brokaw*, 235 F.3d at 1019. To maintain the appropriate balance, we require that case-workers have "evidence to support a 'reasonable suspicion' of past or imminent abuse" before they may take a child into protective custody. *Terry v. Richardson*, 346 F.3d 781, 787 (7th Cir. 2003). "A reasonable suspicion requires more than a hunch but less than probable cause." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (citations and internal quotation marks omitted).

Here, defendants' suspicion of past and possible imminent abuse by Mark was based on definite and articulable evidence—namely, Dr. Laskey's opinion that C.S.'s injuries were caused by an adult using enough force to injure him, and the record of a past accusation of abuse against Mark. Above, we concluded that that evidence was sufficient to establish probable cause. It follows that it must also be sufficient to satisfy the less demanding reasonable suspicion standard. Therefore, we can find no substantive due process violation.

Again, our analysis is influenced by the fact that C.S. remained with his mother. In light of the facts known to defendants, the use of state action to protect C.S.

from his father was reasonable. Therefore, defendants' decision to temporarily remove C.S. from his father's custody was warranted by the state's interest in protecting children from abuse. Whether the state's interest would have justified a greater intrusion on the Silivens' right to familial integrity, such as placing C.S. in foster care, is far from clear. But we need not take that up at this time. Here, it was reasonable for defendants to suspect possible abuse by Mark, and defendants' intrusion on the Silivens' constitutional right to familial integrity was no greater than was necessary to address that danger. *See Wallis v. Spencer*, 202 F.3d 1126, 1140-41 (9th Cir. 2000) (in analyzing due process claim arising out of child abuse investigation, noting that reasonableness of "intrusion on a child's protected privacy and security interests" depends on whether intrusion is "sufficiently . . . 'circumscribed by the exigency that justified' the City's intrusion into the children's lives") (citation omitted).

## C. Procedural Due Process Claim

Finally, the Silivens allege a procedural due process claim, asserting that the removal of C.S. from the home without a hearing violated the due process clause of the Fourteenth Amendment. In this circuit, due process requires, at a minimum, that governmental officials "not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances." *Brokaw*, 235 F.3d at 1020.

In the context of the Fourth Amendment, the question whether exigent circumstances justified a warrantless search is an objective inquiry. *See Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006); *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000). With respect to warrantless searches, we have held that "the government must establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance." *Richardson*, 208 F.3d at 629 (citation omitted). In the context of removing a child from his home, defendants must show that, in light of the facts and circumstances known to defendants at the time of the removal decision, reasonable, experienced caseworkers would have believed that the child was in immediate physical danger in the home. As discussed above, we find that a reasonable caseworker would have drawn that conclusion in this case based on the physical evidence of abuse, combined with the prior accusation of abuse against Mark. Moreover, the scope of the removal was limited to the exigency that justified it, in that C.S. was removed from his father's custody only.

### III. Conclusion

We are not unsympathetic to the Silivens. One can only imagine their frustration when, after reporting potential abuse of their child by a third party, the investigation came to focus on them. However, for the reasons stated above, we conclude that the particular inter-

ference with the Silivens' constitutional rights that oc-
curred here was reasonable in view of the facts known
by defendants and the state's strong interest in pro-
tecting children from abuse. For the foregoing reasons,
we AFFIRM.