In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1737

VASHIR J. XIONG, LIA Y. XIONG, and
R. THOR, a minor by his next friends,

*Plaintiffs-Appellants,*

*v.*

MICHAEL WAGNER, DUTCH LEYDEL,
MARIE FROH, and DANIEL CHIAPPETTA,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 11-CV-288-JPS—**J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 12, 2012—DECIDED OCTOBER 19, 2012

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Racine County Human Services Department caseworker Michael Wagner removed Thor, a 12-year-old child, from his parents' home and placed him into protective custody. Thor suffers from cerebral palsy, global developmental delay, and is confined to a

wheelchair. Wagner commenced an investigation after receiving a referral from personnel at Thor's middle school that had observed bruising on his arm and leg. Thor's mother and stepfather, Lia and Vashir Xiong, and Thor sued caseworker Michael Wagner, Dutch Leydel (Wagner's supervisor), Marie Froh (another caseworker who later worked on the case), and Daniel Chiapetta (Froh's supervisor), alleging violations of their constitutional rights under 42 U.S.C. § 1983 and 42 U.S.C. § 1985. The district court granted summary judgment to defendants on qualified immunity grounds and because plaintiffs had failed to establish sufficient evidence of racial animus. For the following reasons, we affirm the holding of summary judgment in favor of the defendants on all counts.

## I. Background

Thor is a wheelchair-bound 12-year-old afflicted with cerebral palsy and global developmental delay. He has a limited capacity for speech and maintains a cognitive level of approximately a second or third grader. Thor, his mother, and stepfather are all of Hmong ancestry. Upon observing abnormal bruising on Thor's arm and upper leg, Thor's school contacted Racine County Human Services Department ("RCHSD") through a physical abuse referral. Defendant Wagner, an RCHSD investigative caseworker, commenced an investigation in response to the referral on March 24, 2009. When asked by school employees, Thor replied that he did not know how he received the bruises on certain occasions,

whereas on other occasions he indicated that his mother and stepfather had caused the bruising.

Wagner interviewed Thor's 8-year-old brother, P.Y., at school, who stated that Thor's parents had hit Thor as punishment, describing an occasion when Vashir Xiong ("Vashir") allegedly threw him onto the floor. P.Y. also stated that his parents had left Thor home alone at least on the occasion of Lia Xiong's ("Lia") birthday, for approximately two hours, in an area of their home which they enclosed by erecting a sort of furniture blockade. Wagner also interviewed Thor's sister, D.T., at school, who confirmed that Thor was sometimes left at home alone in an enclosed area, specifically on the occasion of Lia's birthday. D.T. also corroborated the method used to confine Thor to a specific area to prevent him from leaving the living room.

Wagner also interviewed Thor at his school. Through interpretation, Thor said that he had been left alone on his mother's birthday and on other occasions. He also stated that his stepfather had caused the bruising on his arm and that as punishment on one occasion his stepfather had picked him up and thrown him. Wagner also examined Thor, including his naked pubic area and took pictures of Thor while undressed. He turned the camera over to school personnel.

On the afternoon of March 24, 2009, Wagner entered the Xiongs' home, accompanied by Caledonia Police Department officers, acting with the authorization of his supervisor Dutch Leydel. Vashir acknowledged that Thor had been left alone at home in the aforemen-

tioned enclosed area on the occasion of Lia's birthday. It apparently had not occurred to either Vashir or Lia that Thor might be endangered at home alone. Wagner removed Thor from his home and placed him in protective custody with a foster parent, Melinda Kasch.

On March 25, 2009, Dr. George Milonas examined Thor. Dr. Milonas was unable to determine the cause of Thor's bruising to a degree of medical certainty. He noted, however, that this case was definitively one of neglect based on the fact that Thor's parents had left him at home alone despite the fact that he required constant supervision.

On March 26, 2009, Racine County Judge Stephan Simanek issued a probable cause order for Thor's temporary removal and continued foster care placement. The probable cause order was based in part on videotaped interviews conducted by Officer Lisa Seils, in which Lia and Vashir admitted to having left Thor at home alone potentially as many as four times between January 1, 2009 and March 24, 2009.

On March 27, 2009, Melinda Kasch indicated that she no longer was capable of caring for Thor. Arrangements were made for Becky Collins, one of Thor's former teachers, to apply for a foster care license and assume Thor's care. On May 4, 2009, Collins informed Wagner that Thor had fallen out of his wheelchair and injured himself, requiring three stitches in his head. Wagner went to Collins' home to investigate the accident on May 5, 2009. He learned that Thor had rolled down the driveway into the drainage system at the end of the

driveway while Collins' husband had gone inside for a short period of time, leaving Thor unattended. The Xiongs dispute whether Thor himself released the wheelchair brake or whether it was never set in the first place.

After Collins indicated that she wished to end Thor's placement with her by June 3, 2009, Thor was temporarily placed at Lakeview Specialty Hospital & Rehab ("Lakeview") on June 1, 2009. On June 19, 2009, the Xiongs' attorney informed Wagner that an accident involving Thor had occurred at Lakeview. While at first Sue Weller, Thor's case manager at Lakeview, stated that she was unaware of any accidents, she later informed Wagner that Thor had in fact fallen from his bed on June 1, 2009, and hit his head. Staff responded to the incident, applied ice to the injury, and performed neurological checks throughout the rest of the evening and following day. Lakeview staff put in place protective mats on the floor surrounding Thor's bed to prevent further injuries. Weller also relayed to Wagner that on two additional days Thor had rolled himself out of bed, though Lakeview's logs indicated that he did not suffer any injuries. On August 7, 2009, Thor was transferred from Lakeview to foster care at the home of Cindy and Jeb Lucht.

Wagner also interacted with the Xiongs regarding Thor's care prior to 2009. Specifically, he was involved in the Xiongs' voluntary petition to the state seeking protective services for Thor in 2005. On March 22, 2005, Wagner wrote a letter to Lia stating that he had received a message from her husband on March 21, 2005, but could

not understand what he said. On April 6, 2005, Wagner wrote an additional letter to Lia stating that he returned her message, but when he called back the person that answered the phone said he had called the wrong number.

Finally, in an April 18, 2005 case note, Wagner indicated that he communicated by phone with Janet Ovel at Family Support Service regarding the Xiongs' case. Ovel told Wagner that Family Support Service would provide the Xiongs with necessary services and that if there was a problem with the parents following through she would notify RCHSD. The note also stated that both Wagner and Ovel felt the family was attempting to manipulate the system via communications between RCHSD and Family Support Service.

The Xiongs filed suit against Wagner, Dutch Leydel, Marie Froh, and Daniel Chiapetta in the United States District Court for the Eastern District of Wisconsin. They alleged that Thor's placement into, and defendants' subsequent failure to remove him from, protective custody in private foster homes and at Lakeview constituted five deprivations of their civil rights under 42 U.S.C. § 1983 and § 1985. Specifically, they alleged violations of all plaintiffs' Fourteenth Amendment due process rights to familial relations, Thor's Fourteenth Amendment right to bodily security and integrity, all plaintiffs' Fourteenth Amendment equal protection rights, and that the defendants conspired to deprive the plaintiffs of their Fourteenth Amendment equal protections rights.

On November 21, 2011, the Xiongs filed a motion for partial summary judgment as to their claims regarding the Xiongs' and Thor's right to familial relations and Thor's right to bodily security and integrity. On December 1, 2011, defendants filed a motion for summary judgment requesting judgment as to all claims. On February 29, 2012, the district court granted defendants' motion for summary judgment on all claims. Judge Stadtmueller ruled that qualified immunity precluded liability for all claims stemming from Thor's removal as well as his continued placement in protective custody. The district court also determined that there was insufficient evidence to establish that racial animus had motivated the defendants' actions and accordingly dismissed plaintiffs' equal protection and conspiracy claims. On March 28, 2012, plaintiffs filed a timely notice of appeal.

## II. Discussion

This court's review of the district court's grant of summary judgment is de novo. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are viewed in the light most favorable to the nonmovants, drawing all reasonable inferences in their favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). To survive a motion for summary judgment, the nonmovants "must make a showing sufficient to establish each

essential element of their cause of action for which they will bear the burden of persuasion at trial." *Billings v. Madison*, 259 F.3d 807, 812 (7th Cir. 2001). Our review of qualified immunity determinations is also de novo. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

Any person who "under the color of law" deprives a person of a right secured by the Constitution may be held civilly liable. 42 U.S.C. § 1983. However, "where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware," qualified immunity shields government actors from liability for civil damages. *Siliven*, 635 F.3d at 925 (citing *Pearson v. Callahan*, 555 U.S. 223, 129 (2009)). In determining whether qualified immunity applies, "a court considers (1) whether the plaintiff's allegations show that the defendant violated a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's conduct." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011) (citation omitted). The court may analyze either prong first, in its discretion. *Id.* "A right is clearly established 'when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear' that 'every reasonable official would have understood that what he is doing violates that right.'" *Id.* at 473-74 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). The plaintiffs need not identify a specific case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 474 (citation omitted).

### A. Thor's Seizure

Plaintiffs first contend that the removal of Thor from their home constitutes a violation of their constitutional rights. Plaintiffs insist that they have not pled a Fourth Amendment claim surrounding Thor's initial removal, but rather that their claims relating to Thor's seizure are properly analyzed under the Fourteenth Amendment. However, in *Hernandez*, a case involving similar allegations of constitutional violations surrounding the removal of a child by social welfare workers, we clarified that where the child *himself* brings a claim regarding his initial removal, the Fourth Amendment provides the proper analytical framework. 657 F.3d at 474 ("[The child's] claim arising from his initial removal is properly analyzed under the Fourth Amendment because it is premised on his seizure and does not coincide with sufficiently separate conduct involving his relationship with his parents."). We explained that "[s]ubstantive due process may not be called upon when a specific constitutional provision [i.e., the Fourth Amendment] protects the right allegedly infringed upon." *Id.* (citation omitted). Accordingly, plaintiff Thor's constitutional claim regarding his initial seizure is properly analyzed under the Fourth Amendment.

The Fourth Amendment's proscription of unreasonable seizures applies in the context of the removal of a child from a home by social welfare workers. *See id.* at 475. "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state

officers 'have reason to believe that life or limb is in immediate jeopardy.' " *Id.* at 474 (citation omitted). Thor's removal from his home and placement into protective custody constitutes a seizure. *Id.* ("Removing [the child] from his home and parents and taking him into protective custody qualifies as a seizure."). Wagner's removal of Thor was not pursuant to a court order or justified by exigent circumstances and therefore must have been supported by probable cause in order to qualify as reasonable.

The probable cause inquiry is an objective one, focused on the facts known to defendants at the time the removal decision was made and upon whether a "prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts." *Id.* at 475 (quoting *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1010 (7th Cir. 2000)). We need not determine whether probable cause in fact existed at the time of Wagner's removal decision. Rather, we may rule on qualified immunity grounds that a reasonable caseworker *could have believed* that probable cause existed and accordingly wouldn't have understood his actions to violate a constitutional right. *Id.* Thus, as long as RCHSD workers "could have believed [Thor's removal] to be lawful, in light of clearly established law and the information [they] possessed," defendants are entitled to qualified immunity. *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

Defendants could have reasonably believed that probable cause existed in this case. In addition to the

referral Wagner received from Thor's school on March 24, 2009, RCHSD's file included two earlier reports from March 10, 2005 and January 30, 2009 similarly recounting incidents suggestive of abuse or neglect. Before removing Thor, Wagner conducted a thorough investigation, interviewing teachers at Thor's school, two of Thor's siblings, and Thor himself. The bruising on Thor's arm and leg, coupled with the corroborated revelations that Thor had been left at home alone for hours at a time and had been thrown onto the ground all suggest that "a prudent caseworker . . . could have believed that [the child] faced an immediate threat of abuse." *Id*. While the Xiongs dispute the accuracy of the statements made to Wagner during his interviews with Thor and his siblings, the relevant inquiry is whether the information actually provided to Wagner at the time was sufficient to trigger a reasonable caseworker's belief that Thor was in imminent danger. We find that this standard is met here.

The Xiongs argue, among other things, that *Hernandez* is distinguishable from the present case because it concerned a case of alleged child abuse (there, the child suffered a broken arm), *id*. at 468, rather than a situation of neglect. While Thor's case was ultimately pursued by RCHSD as one of child neglect rather than abuse, the facts available to Wagner at the time of the removal decision did not clearly indicate that this case was exclusively one of neglect. Wagner initially received a physical abuse intake referral from Thor's teachers, personally observed bruising on Thor's arm and leg, and received information from Thor and his sibling that

Thor had been thrown onto the ground by his stepfather as punishment in the past. Further, a licensed physician could not determine the source of Thor's bruising to a degree of medical certainty. Thus, this case was not clearly characterized as one of neglect at the outset.

Regardless, the district court properly explained that where neglect, like abuse, provides sufficient grounds for removal, the probable cause analysis is equally applicable in that context. Indeed, in *Brokaw*, we applied the probable cause inquiry in a case asserting various § 1983 claims surrounding a situation of alleged child neglect. 235 F.3d at 1011. Thus, because defendants could have reasonably believed that probable cause existed sufficient to justify Thor's seizure—and accordingly would not have understood their actions to violate clearly established law—qualified immunity shields them from any alleged liability stemming from Thor's initial removal. We therefore affirm the grant of summary judgment in defendants' favor on this claim.

## B. Right to Familial Relations and Continued Withholding

Plaintiffs also allege that their forced separation from Thor violated their Fourteenth Amendment right to familial relations.[1] This court has recognized that the

---

[1] Plaintiffs disavow the notion that their substantive due process claim is based solely on Thor's initial removal, empha-

(continued...)

Fourteenth Amendment includes the right to associate with relatives, *Mayo v. Lane*, 867 F.2d 374, 375 (7th Cir. 1989), and therefore that substantive due process includes the right to familial integrity. *Brokaw*, 235 F.3d at 1018.

However, like the Fourth Amendment, the Fourteenth Amendment right to familial integrity is not absolute. *Id.* at 1019. Rather, "a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." *Id.* Caseworkers achieve the proper balance where they have "'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse before they . . . take a child into protective custody." *Hernandez*, 657 F.3d at 478 (quoting *Brokaw*, 235 F.3d at 1019). To qualify as a "reasonable suspicion," caseworkers must have "more than a hunch but less than probable cause." *Id.* (quoting *Siliven*, 635 F.3d at 928).

We have already established that a reasonable caseworker could have believed that probable cause existed

---

[1] (...continued)

sizing that the court should assess their entire period of separation from Thor in the aggregate. If Lia and Vashir *had* advanced a claim based solely on Thor's initial removal, the result would be identical to that of Thor's Fourth Amendment claim: Parents' substantive due process claims "stand or fall with [the child's] Fourth Amendment claim premised on his removal." *Hernandez*, 657 F.3d. at 478.

sufficient to justify the initial decision to remove Thor. Thus, the less demanding standard of "reasonable suspicion" is met with respect to Wagner's initial decision to remove Thor from the Xiongs' residence.

However, the continued withholding of a minor may constitute a constitutional violation where probable cause or reasonable suspicion dissipates. *See id.* at 480. While Lia and Vashir Xiongs' claim surrounding their continuing separation from Thor is properly analyzed under the Fourteenth Amendment, *Brokaw*, 235 F.3d at 1019 ("substantive due process provides the appropriate vehicle for evaluating the constitutionality of the nearly four-month government-forced separation of [the child] from his parents.");[2] *see also Hernandez*, 657 F.3d at 480 ("[The child's parents] were not seized; their continued withholding claims are properly analyzed under substantive due process."), Thor's continued withholding claim is properly analyzed under a Fourth Amendment framework. *Id*. ("Other than the passage of time, the harm [the child] complains of is no different than the harm he alleges was caused by his initial removal . . . Therefore [the child's] continued withholding claim is analyzed under the Fourth Amendment."). Thus, while reasonable suspicion provides the standard under which

---

[2] We acknowledged in *Brokaw*, however, that allegations of constitutional violations surrounding the initial removal of a child "should be considered under the Fourth Amendment, not under the rubric of substantive due process." 235 F.3d. at 1018.

Lia and Vashir's continuing separation claim must be analyzed, probable cause again provides the applicable standard with respect to Thor's continued separation claim.

It is undisputed that on March 26, 2009, Judge Simanek ruled that probable cause justified Thor's continued placement in protective custody. Accordingly, the relevant inquiry is whether any reasonable caseworker would have been required to believe that reasonable suspicion or probable cause dissipated between March 24, 2009, when Wagner removed Thor, and March 26, 2009, when Judge Simanek's ruling was issued.

There is no evidence that probable cause or reasonable suspicion dissipated during the brief period in question. During that period, Dr. Milonas's medical examination of Thor confirmed that the present case was definitively one of at least neglect. Plaintiffs argue that Dr. Milonas's report also found that Thor may have injured himself by thrashing, ruling out abuse. However, the report did not remove concerns about abuse or neglect. Dr. Milonas stated that he could not identify the source of Thor's bruising to a degree of medical certainty. A reasonable caseworker reading his opinion would not have been required to conclude that reasonable suspicion or probable cause dissipated based on his inconclusive statement. Further, during this period Lia and Vashir indicated in taped interviews with Officer Seils that they had in fact left Thor at home alone on multiple occasions. These revelations tend to bolster, rather than undermine, defendants' belief that Thor was in

danger at that time. It therefore remained reasonable for Wagner to believe that reasonable suspicion and probable cause had not dissipated and to keep Thor in protective custody.

Plaintiffs argue that Judge Simanek's probable cause ruling was based on improper information. Specifically, they contend that Thor had only been left alone for two hours on the occasion of Lia's birthday, rather than several hours, as Judge Simanek suggested in his order. To this end, plaintiffs quote language from *Brokaw* indicating that due process "at a minimum . . . requires that government officials not misrepresent facts in order to obtain the removal of a child from his parents." 235 F.3d at 1020. First, we made these statements in *Brokaw* in the context of analyzing a procedural due process claim, rather than a substantive due process claim (at issue here). *Id.* Second, Wagner did not make any misrepresentations or knowingly false statements of the sort alleged in *Brokaw*. *See id.* at 1021. The fact that he failed to interrupt Judge Simanek to correct a word choice does not violate plaintiffs' substantive due process rights. In any event, this argument does not provide any evidence relevant under the applicable standard of whether a reasonable caseworker would have believed that reasonable suspicion or probable cause dissipated.

Finally, the Xiongs suggest that defendants violated their familial integrity rights by failing to make reasonable efforts to prevent Thor's removal, by making no effort to place Thor with local relatives, and by failing to

make reasonable efforts to reunify the Xiong family. However, these arguments do not address the relevant standard of whether a reasonable caseworker could have believed that probable cause existed to justify Thor's removal in the first place or whether probable cause or reasonable suspicion dissipated during the period in question. Defendants are entitled to qualified immunity for any alleged violation of plaintiffs' right to familial relations, and therefore summary judgment in their favor is appropriate.

### C. Right to Bodily Security and Integrity

Plaintiffs next argue that defendants violated Thor's Fourteenth Amendment right to bodily security and integrity. The Fourteenth Amendment guarantees that "a child has a constitutional right to be placed into a safe and secure foster home." *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005). However, state actors are liable for breaching this right only if they violate "the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian . . . *whom the state knows or suspects to be a child abuser*." *Id.* (quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (emphasis in original)). For purposes of our qualified immunity analysis, liability turns upon whether a reasonable caseworker would have "actual knowledge or suspicion of the risk of harm the child may suffer while in foster care." *Id.* at 666-67; *see also J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 795 (7th Cir. 2003) ("[L]iability will only arise if the state actor

knows or suspects that the agency or foster parents with whom a child is placed are likely to abuse the child."). We have described this standard as one of modified deliberate indifference. *Waubanascum*, 416 F.3d at 666.

### i. Foster Placements

Plaintiffs first allege that defendants' failure to remove Thor from foster care with Collins violated his right to bodily security and integrity under the Fourteenth Amendment. To support this claim, they point to the May 4, 2009 incident in which Thor's wheelchair rolled down the Collins' driveway while in their care. Thor was in fact left unattended for a brief period of time and did suffer an injury requiring stitches.

However, the facts viewed even in the light most favorable to plaintiffs clearly indicate that Thor's fall was the result of an accident, rather than abuse or neglect. Even if Collins or her husband had failed to set Thor's wheelchair brake (as opposed to Thor himself having released it, a point that the parties dispute), the Xiongs point to no evidence suggesting abusive intent or disregard sufficient to rise to the level of neglect on Collins' part. Collins promptly responded to the incident, brought Thor to the emergency room, and informed Wagner of what had occurred. Wagner performed an investigation the following day. In light of these facts, a reasonable caseworker would not have developed a suspicion or have any actual knowledge that Collins had abused or neglected Thor, or would do so in the future.

The Xiongs next allege that defendants' failure to remove Thor from foster care at Lakeview violated his right to bodily security and integrity. To this end, they identify the repeated instances of Thor falling or rolling out of bed during his time there, sustaining minor injuries on one occasion. The Xiongs argue that these instances constitute evidence which would place a reasonable caseworker on notice of a pattern of neglect in the facility.

The daily Lakeview logs indicate that Thor fell from his bed on three different days (June 1, June 3, and June 11, 2009). The record also indicates, however, that the Lakeview staff adopted various appropriate measures to promptly respond to these incidents. Following Thor's June 1, 2009 fall, the only fall resulting in injury, Thor was quickly treated and staff performed follow-up neurological checks throughout the rest of the evening and following day. Lakeview staff also placed protective mats around his bed to provide cushioning in the event of another fall. Upon learning of the June 1, 2009 incident, Wagner contacted Weller at Lakeview to inquire. Weller ultimately relayed the above information regarding Thor's fall and treatment, and she described the precautions taken to prevent further injuries. At Lakeview, Thor was at all times under the care of licensed physicians who took protective measures to ensure his safety and responded promptly to all incidents. Armed with these facts, a reasonable caseworker would not have actual knowledge or a suspicion that Thor was being abused or neglected at Lakeview. Contrary to plaintiffs' assertion, Wagner's awareness

that Thor suffered injuries while in foster placement at Lakeview does not compel the conclusion that a reasonable caseworker would know or suspect that Thor was likely to be neglected in that facility. Indeed, the facts surrounding the incident at Lakeview, like those surrounding the circumstances at Collins' home, indicate a contrary finding: that the injuries were the result of accidents. Defendants are entitled to qualified immunity for any alleged breach of Thor's right to bodily security and integrity based on the decision to continue his placement with Collins and at Lakeview.

### ii. Right to Individualized Treatment

Plaintiffs next allege that defendants violated Thor's right to bodily integrity by failing to provide him with appropriate individualized treatment. Specifically, the Xiongs argue that defendants' failure to obtain counseling services for Thor after he had suicidal ideation violated his Fourteenth Amendment rights. "When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide." *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974). Accordingly, the Fourteenth Amendment "right to treatment" includes the "right to minimum acceptable standards of care and treatment for juveniles and the right to individualized care and treatment." *Id.*

In their amended complaint, plaintiffs advanced the general claim that defendants failed to comply with

their obligation to provide adequate medical care to Thor during custody. Defendants argue that any right to individualized treatment claim was not properly pled, contending that the thrust of plaintiffs' bodily security and integrity claim concerned defendants' failure to remove Thor from his placements with Collins and at Lakeview, rather than the failure to provide medical care.

In fact, plaintiffs did not mention the Fourteenth Amendment right to individualized treatment until their motion for partial summary judgment. In *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800 (7th Cir. 2011), this court upheld the district court's rejection of a new, fourth theory of discrimination presented for the first time in opposition to summary judgment. *Id.* at 806; *see also Andree v. Ashland Cnty.*, 818 F.2d 1306, 1314 n.11 (7th Cir. 1987) (upholding the district court's rejection of a theory raised for the first time in opposition to summary judgment because their "complaint did not give fair warning of the theory"). Plaintiffs' generalized assertion that defendants were obligated to provide Thor with adequate medical care may not have given defendants fair warning of this particular theory of relief. However, even assuming that plaintiffs' passing mention of the right to adequate medical care provided defendants with sufficient notice of the claim concerning Thor's right to individualized treatment, this claim does not prevail on the merits.

In *Nelson*, the primary case relied upon by plaintiffs, we determined that juveniles placed in a correctional facility have a substantive due process right to individualized treatment. *Id.* at 360. We found that the state had

violated this right by substituting a behavioral classification system, which classified juveniles based on their behavior and personality types, for individual treatment and attention. *Id.* In that case, "the record show[ed] very little individual treatment programmed, much less implemented." *Id.*

In the present case, by contrast, the record reveals substantial evidence that Thor received individualized care from licensed physicians. Thor received numerous physical therapy sessions, occupational therapy sessions, speech improvement sessions, and professional evaluations while at Lakeview. Doctors at Lakeview were aware of Thor's depressive thoughts and elected in their discretion not to provide counseling. Further, defendants were aware that the Lakeview staff took prompt action in response to the accidents Thor suffered as a result of falling out of bed. It cannot be said that defendants' conduct, in failing to direct Lakeview to provide Thor with counseling, "violated 'clearly established' constitutional rights [here, failure to provide individualized treatment] of which a reasonable person would have known." *K.H*, 914 F.2d at 855 (quotation omitted). Accordingly, to the extent the claim was properly pled, defendants are entitled to qualified immunity for any alleged breach of Thor's right to individualized treatment.

### iii.  Examination of Thor's Bruising

Plaintiffs also argue that Wagner's examination of Thor's pubic area for bruising violated Thor's right to bodily security and integrity. The district court determined that

this argument had been waived, finding that plaintiffs deprived defendants of fair notice by failing to mention this theory of recovery at any stage prior to summary judgment. On appeal, the plaintiffs have not articulated any argument challenging the district court's finding of waiver. The Xiongs suggest only that Wagner's examination of Thor violated his Fourteenth Amendment rights and reference the relevant facts, without addressing the district court's conclusion regarding the adequacy of their pleadings. Because plaintiffs have not advanced an argument on appeal challenging the district court's finding of waiver, their argument concerning the examination of Thor's bruising is waived on appeal. *See, e.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

### D.  All Plaintiffs' Rights to Equal Protection

The Xiongs next argue that defendants violated their Fourteenth Amendment equal protection rights by treating them adversely on the basis of their Hmong ancestry. It is clearly established that such racial or ethnic discrimination would violate the Equal Protection Clause; however, defendants are entitled to summary judgment on the merits of these claims. To establish a violation of the Fourteenth Amendment's Equal Protection Clause, a plaintiff must demonstrate that a "state actor has treated him differently from persons of a different race and that the actor did so purposefully." *Billings*,

259 F.3d at 812. If the Xiongs "do not produce evidence sufficient to sustain a jury verdict in their favor, we shall affirm the district court's grant of the defendants' motion for summary judgment." *Id.*

Plaintiffs have not produced evidence sufficient to meet this standard. The Xiongs' basic argument is that Wagner harbored racial animus toward them dating back to 2005 and that this animus motivated all of Wagner's subsequent adverse decisions affecting their family. As evidence of racial animus, the Xiongs identify Wagner's 2005 case note stating that the family was attempting to manipulate the system and his 2009 communication to Weller indicating that he was not sure if the parents were being truthful regarding the first incident of Thor falling out of bed at Lakeview. The Xiongs assert that such animus resulted in, among other things, Wagner's failure to correct Judge Simanek's statement that Thor was left alone for "several hours," his failure to direct doctors to provide Thor with counseling services at Lakeview, and his search of Thor's pubic area for bruising.

While reasonable inferences must be drawn in the Xiongs' favor, "[e]ven on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Based on the record available, no reasonable juror could infer that Wagner's statements demonstrate the existence of racial animus toward the Xiongs. No reference whatsoever to

the Xiongs' racial background is contained in Wagner's aforementioned case note or communication to Weller, nor could a reasonable juror conclude that these statements reflect any sort of discreet racial undercurrent. Without more, the mere fact that the aforementioned events took place and that the involved caseworkers were not of Hmong ancestry does not amount to evidence "sufficient to sustain a jury verdict" in the Xiongs' favor as to their equal protection claim. *Billings*, 259 F.3d at 812.

Plaintiffs next argue that defendants applied unequal standards to similarly situated individuals. Specifically, they point to the fact that Thor suffered bruising while in foster placement with Collins and at Lakeview that was not investigated in the same fashion as the bruises that Thor manifested while living with the Xiongs. They attribute this disparate treatment to their Hmong ancestry. But as the district court explained, for this claim to prevail, the disparate treatment would have to be in response to reasonably comparable circumstances. Wagner's investigation of the Xiongs was in response to a physical abuse referral from Thor's school that was corroborated by information relayed by members of the Xiong family signaling neglect and possible abuse. No formal physical abuse referrals were filed concerning the injuries Thor suffered while in foster care, nor did Wagner's inquiries surrounding these incidents reveal corroborated information indicating neglect of the sort disclosed by Thor and his siblings.

Indeed, Wagner's inquiries revealed that the circumstances surrounding the incidents of bruising Thor

suffered while in foster care were entirely distinct from the situation at the Xiongs. Collins herself contacted Wagner following Thor's injury to inform him of what had occurred. In that instance, Thor was left unattended in his wheelchair for only a brief period while Collins' husband went into the house, as compared to the hours-long period during which Thor was left at home alone by the Xiongs. At Lakeview, Thor was monitored by professional physicians who provided him with individual treatment and took protective measures in response to his having rolled out of bed. The corroborated information Wagner received suggesting that Thor had been deliberately thrown onto the floor by his stepfather at the Xiongs' home thus stands in stark contrast to the care Thor received at Lakeview. It is therefore clear that Wagner had "race-neutral reasons" for making different decisions relating to appropriate investigatory measures in each circumstance. *See id.* at 813. No genuine dispute exists as to whether a "a state actor has treated [plaintiffs] differently from persons of a different race and that the state actor did so purposefully," *id.* at 812, and we therefore affirm the district court's grant of summary judgment in defendants' favor on this claim.

### E.  Conspiracy to Violate Constitutional Rights

Finally, plaintiffs argue that defendants conspired to violate their equal protection rights under the Fourteenth Amendment. A party may recover damages if two or more persons conspire for the purpose of depriving the

plaintiff of the equal protection of the laws. 42 U.S.C. § 1985(3). To recover under § 1985(3), a party must establish:

> (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens.

*Brokaw*, 235 F.3d at 1024. To establish "purpose" under prong two, a plaintiff must demonstrate racial, ethnic, or other class-based "invidiously discriminatory animus behind the conspirators' actions." *Id.* As discussed, plaintiffs have not made a showing sufficient to establish the existence of racial animus on the part of defendants. Accordingly, plaintiffs' conspiracy claim falls with their equal protection claim, and summary judgment in defendants' favor is appropriate.


### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for the defendants on all counts.